## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RONALD A. BERUTTI and | ) | |
| MURRAY-NOLAN BERUTTI LLC, | ) | **CIVIL ACTION** |
| On their own behalves and on behalf | ) | |
| Of all other members admitted to the | ) | |
| Bar of the United States District Court | ) | |
| for the District of New Jersey, | ) | |
| including those admitted *pro hac vice,* | ) | **Civ. No.** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HONORABLE FREDA L. | ) | |
| WOLFSON, U.S. Chief District Judge, | ) | |
| District of New Jersey, in her judicial | ) | |
| capacity, and The UNITED STATES | ) | |
| DISTRICT COURTFOR THE DISTRICT | ) | |
| OF NEW JERSEY | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

### PLAINTIFF'S BRIEF IN SUPPORT OF ORDER TO SHOW CAUSE
### FOR PRELIMINARY INJUNCTION

---

**MURRAY-NOLAN BERUTTI LLC**
100 E. Hanover Avenue, Suite 401
Cedar Knolls, New Jersey 07927
Phone: 908-588-2111
ron@murray-nolanberutti.com
Attorney for Plaintiffs

On the Brief:
Ronald A. Berutti – N.J. Atty ID No. 023361992

## **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... ii

STATEMENT OF JURISDICTION................................................................................1

PRELIMINARY STATEMENT .....................................................................................1

STATEMENT OF FACTS ..............................................................................................4

LEGAL ARGUMENT...................................................................................................15

POINT I:  THE ORDER VIOLATES THE STATUTE OF REGULATION, AND THUS, IS UNENFORCEABLE AND VOID.............................................................................15

POINT II: THE ORDER VIOLATES THE FIRST AMENDMENT  . ........................17

POINT III: THE ORDER VIOLATES THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT  ..................................................................................21

CONCLUSION.............................................................................................................24

## TABLE OF AUTHORITIES

**Page**

### Cases

*A Book Named "John Cleland's Memoirs of a Woman of Pleasure"*
  *v. Attorney Gen. of Mass.*, 383 U.S. 413, 429-30 (1966) ..................................................... 17

*Alden v. Maine*, 527 U.S. 706, 733 (1999). ................................................................................. 18

*Allen v. Debello*, 861 F.3d 433, 440 n.31 (3d Cir. 2017) ............................................................ 23

*Cities Serv. Co. v. Gulf Oil Corp.*, 1999 OK 16, ¶ 14 n.1(1999) ................................................. 19

*Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973)................................................. 22

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228; 2022 U.S.

  LEXIS 3057 *148 (2022)   .......................................................................................... 19, 22, 23

*Eisenstadt v. Baird*, 405 U.S. 438, 447 (1972) ............................................................................. 22

*Johnson v. Board of Governors of Registered Dentists*, 1996 OK 4
  P19, 913 P.2d 1339, 1345 .................................................................................................... 19

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of*
  *Jacksonville*, 508 U.S. 656, 666 (1993)............................................................................... 20, 21

*Romer v. Evans*, 517 U.S. 620, 633-34 (1996) ...................................................................... 21, 22

*Shelley v. Kraemer*, 334 U.S. 1, 22 (1948) ............................................................................... 22

*Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942)............................................ 22

*Sweatt* v. *Painter*, 339 U.S. 629, 635 (1950)......................................................................... 21, 22

*Tennessee v. Lane*, 541 U.S. 509, 522 (2004)............................................................................. 23

*Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). ........................................................... 19

*Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) ........................................................................ 22

## STATUTES

21 U.S.C. § 300bbb.............................................................................................................. 1, 15

21 U.S.C. § 300bbb-3(c)(3)-(4) .............................................................................................. 1

21 U.S.C. § 300bbb-(e)(1)(B) ............................................................................................... 16

45 C.F.R. § 45.116(b)(8).......................................................................................................... 2

§564(e)(1)(A)(ii)................................................................................................................. 2, 16

## STATEMENT OF JURISDICTION

This action is a challenge to a standing order of the defendant, Honorable Freda L. Wolfson, United States Chief Judge for the District of New Jersey, and pertains to the operations of the United States District Court for the District of New Jersey, and otherwise is related to similar such Orders in all United States District Courts. Thus, this Court has exclusive jurisdiction over the issues involved herein.

## PRELIMINARY STATEMENT

On September 13, 2021, Honorable Freda L. Wolfson, United States Chief District Judge for the District of New Jersey ("Judge Wolfson") entered Standing Order 2021-08 of the District (the "Order"), which compelled those seeking entry in the courthouses within the District of New Jersey ("District") either to present a vaccine card, or to have a recent negative PCR test. Defendant William T. Walsh is the Clerk of the District Court and is charged with carrying out such Order.

At the time the Order was promulgated, and at present, all or virtually all available so-called COVID-19 vaccines are available only because the U.S. Food and Drug Administration ("FDA") has granted them Emergency Use Authority ("EUA") pursuant to 21 U.S.C. § 300bbb (the "Statute"). EUA status may only be permitted when there is "no adequate, approved, and available alternative to the product." 21 U.S.C. § 360bbb-3(c)(3)-(4). Both Pfizer and Moderna have full FDA

approval for COVID-19 vaccines, but neither is manufacturing same such that only the EUA vaccines are available. Evidence of this includes that Johnson & Johnson, which does not have a fully FDA approved COVID-19 vaccine, continues to have its EUA vaccine available, meaning that there remains "no adequate, approved, and available alternative" to its EUA product, as a matter of law.

The Statute provides, in sub-§ (III), that individuals must be apprised **"of the option to accept or refuse administration of the product**, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks." The Statute further provides, §564(e)(1)(A)(ii), that its "conditions [are] designed to **ensure** that individuals to whom the product is administered are informed," of their rights.

Moreover, the FDA's "informed consent" regulation leaves no room to doubt that coercion of any kind is prohibited. 45 C.F.R. § 45.116(b)(8) (the "Regulation") provides the following as being fundamental to informed consent (emphasis added): **"A statement that participation is voluntary, refusal to participate will involve no penalty or loss of benefits to which the subject is otherwise entitled, and the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled."**

The plaintiff was barred from entry into the District's Trenton courthouse on June 6, 2022. The ban violates the Statute and the Regulation since it punishes those

2

not coerced into vaccination with an EUA vaccine. The Order tacitly would coerce the plaintiff and those similarly situated, both in the District and in other Districts, to be vaccinated or to take a PCR test, which is not approved for use for COVID-19 at all. Such Order thus violates the Statute and Regulation, and is unenforceable and void.

Moreover, as a member in good standing of the District Bar, due to the Order, the plaintiff Ronald A. Berutti ("Mr. Berutti") is denied his rights under the First and Fourteenth Amendments of the United States Constitution. Regarding the First Amendment violation, the long-established common law "right of audience" with the Court evidences an intent that licensed and otherwise qualified attorneys, such as the plaintiff, must be permitted to appear before the Court and argue cases on behalf of their clients as part of the First Amendment. Mr. Berutti was denied this First Amendment right due to the Order, on behalf of his and the clients of plaintiff Murray-Nolan Berutti LLC (the "Firm"). It is unprecedented that attorneys are barred from exercising such fundamental right--one which goes to the heart of our system of government, given the importance of the proper functioning adversarial system and the protection of liberty--based on vaccination status. The Order fails to satisfy the strict scrutiny standard that must be applied and, thus, must be vacated.

Further, Mr. Berutti and those similarly situated are denied the equal protection of the laws by virtue of the Order, since a new qualification is added to

3

their right and ability to advocate for their clients which, again, is unprecedented. Moreover, not only do coercive measures violate the Statute, but the science reveals that the vaccines are neither effective for over 98% of individuals receiving the shots even in optimal circumstances, nor that they are safe, given that *more than twice as many deaths have been reported to the U.S. Centers for Disease Control ("CDC") via its Vaccine Adverse Events Reporting System ("VAERS") than as having occurred because of the so-called COVID-19 vaccines than occurred among all of the United States military during the entirety of the Afghanistan and Iraq wars combined.* It is not that vaccines per se are dangerous; however, these particular shots, scientifically, are unlike traditional vaccines as is demonstrated by the plaintiffs, and are actually making Covid worse. Thus, to coerce attorneys in our federal courts to become 'vaccinated' with these experimental shots which are neither safe nor effective scientifically or in the historical sense, is completely irrational and dangerous, as the Order exposes attorneys to great harm or death with such coercion.

## STATEMENT OF FACTS

### A. The Plaintiffs are Barred from the Courthouse Because of the Order.

On June 6, 2022, Mr. Berutti was scheduled to appear in court within the District in Trenton. (Comp. ¶13). It was his first appearance in federal court since before the COVID-19 pandemic began subjecting the courts to closure, on or about

4

March 13, 2020. (Id.) Mr. Berutti was confronted by U.S. Marshalls at the entrance of the building who asked whether Mr. Berutti could produce a vaccine card. Mr. Berutti did not produce one and gave no reason for not producing one. (Id. ¶14). The U.S. Marshalls at the entrance then requested whether Mr. Berutti had a recent PCR test result, which he did not. (Id. ¶15). When he arrived at the courthouse, Mr. Berutti was unaware of the Order and of the requirement that he produce a vaccine card or a negative PCR test. (Id. ¶16). Mr. Berutti exhibited and had no symptoms of COVID-19 or any other communicable disease or illness when he entered the courthouse. (Id. ¶ 17). Mr. Berutti was thereafter instructed to wait in his automobile and the Court would call him with instructions. (Id. ¶ 18).

Shortly after arriving in his automobile, Mr. Berutti received a call from Honorable Peter G. Sheridan, U.S.D.J., who advised that Mr. Berutti's two adversaries were in the courtroom, and that if Mr. Berutti had no objection, Judge Sheridan would entertain oral argument with his adversaries in the courtroom and Mr. Berutti remotely in his automobile. (Id. ¶19). Mr. Berutti objected on grounds that the Order violated his Equal Protection rights under the 14th Amendment of the United States Constitution, and that the Order violated the Statute and the Regulation. (Id. ¶20).

### B. **The Order.**

Among other things, the Order requires that attorneys and others visiting courthouses within the District provide "[a]cceptable proof of vaccination" against COVID-19. (Id. ¶20, Ex. A). Alternatively, the Order permits entry upon "proof of a negative result from a PCR test (not a rapid test) taken no more than 72 hours prior to seeking entry…" (Id. ¶21). It is believed that other U.S. District Courts have similar Orders in place. (Id. ¶22)

### C. **The Statutory Prohibition of the Order.**

All or virtually all presently available purported COVID-19 vaccines are available only because they have received EUA approval by the FDA pursuant to the Statute. (Id. ¶24). PCR tests likewise had been authorized by the FDA as EUA. (Comp. ¶25, **Ex. 4**). Effective January 1, 2022, such EUA approval was withdrawn, such that PCR tests are no longer authorized for use in testing for the SARS-CoV-2 virus, which sometimes causes COVID-19. (Comp. ¶26, **Ex. 4**). Although the FDA has given full, unconditional approval for two COVID-19 vaccines, those two being Pfizer's Comirnaty and Moderna's Spikevax, neither such vaccine is presently being manufactured or otherwise is available to the public except, possibly, in extremely limited quantities. (Comp. ¶27, **Exs. 5, 6, 7, 8, 9**). Indeed, if Comirnaty and Spikevax were being manufactured and were generally available to the public, then pursuant to the Statute, Pfizer, Moderna, and Johnson & Johnson would no longer be

6

permitted to distribute their EUA authorized vaccines, as non-EUA vaccines would be available for use. (Comp. ¶28). If non-EUA vaccines were made available, then these pharmaceutical manufacturers would lose their immunity for use. (Id. ¶29; Statute).

Pursuant to the Statute's "informed consent" provision, any person given the option to take an EUA product, be it a vaccine, a drug, or a therapy, has an absolute right to refuse such EUA product. (Id. ¶30). Pursuant to the Regulation: **"A statement that participation is voluntary, refusal to participate will involve no penalty or loss of benefits to which the subject is otherwise entitled, and the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled,"** is required whenever an individual is offered a  so-called COVID-19 vaccine. (Id. ¶31). Since only EUA vaccines are available, the Order cannot coerce or penalize those who refuse vaccination, who refuse to produce a vaccine card, or those who refuse to take an unauthorized PCR test. (Id. ¶32).

### D. The So-Called COVID-19 Vaccines are not Effective.

Moreover, the purported vaccines are neither safe nor effective based on traditional metrics of safety and effectiveness. (Id. ¶33; Babich Dec.¶¶1; Pedulla Dec. ¶¶ 2). In 2017, the FDA published proposed guidance as to truth in advertising which would have required that if a product's effectiveness is to be advertised, the

7

pharmaceutical company should base such effectiveness on the Absolute Risk Reduction ("ARR") of the product, which is a percentage of those receiving a benefit from the product as measured against the entire population of those administered the product in the pharmaceutical study. (Comp. ¶34). In such proposed guidance, the FDA suggested that for proof of effectiveness, the Relative Risk Reduction ("RRR") should not be used or, if used, should be compared to the ARR. (Comp. ¶35). The RRR merely compares the number of people in the study who contracted SARS-2, the virus which sometimes causes COVID-19, against those in the study who contracted SARS-2 who had been administered a placebo. Such comparison was of mere fractions of a much greater number of individuals who received the shots in all three studies (Pfizer, Moderna, and Johnson & Johnson), the overwhelming majority--over 98% --of whom saw no benefit at all from the shots in each case (Comp. ¶36-38; Pedulla Dec. ¶ 41)

The so-called COVID-19 vaccines that have been approved for EUA, according to the pharmaceutical companies' own published trial data, all had a very low possibility of providing a personal benefit to individuals in general even in optimal, pre-variant, circumstances. As will be detailed below, variants make the so-called vaccines even less effective and, perhaps, completely worthless. (Comp. ¶37; Pedulla Dep. ¶16, 17). More specifically, the studies of the three available EUA shots were commonly being touted as being around 95% effective, which was the

8

RRR. However, that ARR--which compares the total number of those who received a benefit from the shot against the whole population of those receiving the shot in the study--for each was below 2%, and for Pfizer it was below 1%. *This is not speculation; the information comes directly from the three manufacturers' own published study data*. (Comp. ¶38; Pedulla Dec. ¶18, 39)

### (i)     The Pfizer study.

An article published in the New England Journal of Medicine, December 10, 2020, titled "Safety and Efficacy of BNT162b2 mRNA Covid-19 Vaccine," details the results of Pfizer's Phase 3 study of its commonly available EUA vaccine. (Comp. ¶39; Pedulla Dec. **Ex. 2e**). On page 2, under "Results" the authors note that there were a total of 43,548 participants in the study, all of whom received injections. 21,720 received the Pfizer vaccine, and the remaining 21,728 received a placebo. (Comp. ¶39; Pedulla Dec. 25-28). **Of the 21,720 participants who received the so-called vaccine, only 8 came down with cases of COVID-19 at least 7 days after the second dose. Of those receiving the placebo, only 162 cases of SARS-2 (the virus that in only some cases caused COVID-19) were reported after at least 7 days.** (Comp. ¶40; Pedulla Dec. 26). Relative to placebo, there were 154 fewer cases of SARS-2 among those injected with the Pfizer shot versus those receiving placebo (162 people). Thus, the RRR is calculated as 154/162, or 95%. Such percentage is the commonly used "effectiveness" percentage which was widely reported to the

general public. (Comp. ¶42; Pedulla Dec. 27). However, **the Pfizer ARR--meaning the percentage of people actually benefitting from the Pfizer vaccine across the entire population of those receiving the shot in the study--is calculated at 154/21,270, or a mere 0.73% (rounding up) effectiveness rate.** (Comp. ¶43; Pedulla Dec. 28). Another way of looking at this number is that **more than 138 individuals must be vaccinated for 1 person to receive a benefit** from the vaccine (21,270/154). (Comp. ¶44; Pedulla Dec. 29). Thus, the Pfizer vaccine, under the optimal pre-variant circumstances of the time, was barely effective at all in terms of actually reducing the risk that a person receiving the shot **actually** would receive a benefit from the shot. These calculations are from taken from Pfizer's own data. (Comp. ¶45; Pedulla Dec. 29)

    **(ii)   The Moderna study.**

An article was published December 30, 2020 in the <u>New England Journal of Medicine</u>, titled "Efficacy and Safety of the mRNA-1273 SARS-CoV-2 Vaccine", regarding the Moderna vaccine. (Comp. ¶46; Pedulla Dec. **Ex. 2f**). The article details that of the total of 30,420 participants in the study was broken down into equal numeric groups of 15,210 participants, half who received the Moderna shot, and the other half who received a placebo. (Comp. ¶47; Pedulla Dec. 31) Of those injected with the Moderna shot, only 11 participants tested positive for SARS-2 after at least 14 days. Of those receiving a placebo, only 185 participants tested positive.

Consequently, a total of 174 people benefitted from the Moderna shot (185-11), when compared relatively to placebo. Thus, the highly discussed RRR benefit of the vaccine is calculated as 174/185, or 94%. (Comp. ¶48; Pedulla Dec. 32). However, **the ARR is calculated as 174/15,210, or 1.15% (again, giving Moderna the benefit of the doubt, and rounding up), because only 174 people out of a total of 15,210 with a placebo became infected with SARS-2 during the test period.** (Comp. ¶49; Pedulla Dec. 33) Another way of looking at this is that **more than 87 people have to be vaccinated for 1 person to receive a benefit**. (15,210/174). (Comp. ¶50; Pedulla Dec. 33).

### (iii)   The Johnson & Johnson study.

An article in the New England Journal of Medicine titled "Safety and Efficacy of Single-Dose Ad26.COV2.S Vaccine against Covid-19", was published June 10, 2021, regarding the Johnson & Johnson vaccine. (Comp. ¶51; Pedulla Dec. ¶34, **Ex. 3g**). Johnson & Johnson injected 19,630 participants with their shot, and 19,681 with placebo. (Comp. ¶52; Pedulla Dec. 35). Relative to those receiving placebo, a total of 116 of those who were vaccinated contracted SARS-2 within at least 14 days thereafter, compared to 348 in the placebo group. Thus, 232 people injected with the vaccine benefitted from receiving the vaccine relative to the placebo group (348-116). Consequently, the RRR for the Johnson & Johnson vaccine is calculated as 232/348, or 67% (rounding up). (Comp. ¶53; Pedulla Dec. 36). After at least 28 days,

11

66 of those receiving the vaccine tested positive for SARS-2, while 193 cases were recorded in the placebo group, thus constituting a net relative benefit to 127 people (193-66). Thus, after at least 28 days, the RRR for the Johnson & Johnson vaccine is calculated as 127/193, or 67% (rounding up). (Comp. ¶54; Pedulla Dec. 37). Giving Johnson & Johnson the full benefit of the doubt by adding the 14 and 28 day beneficial recipient number together (232+127), the Johnson & Johnson shot provided an actual benefit to 359 individuals. Thus, **ARR--the percentage of people who received that shot who actually received a benefit from receiving the vaccine--is calculated as 359/19,630, or 1.83%.** (Comp. ¶55; Pedulla Dec. 38). Another way of looking at these numbers is that more **than 54 people have to be vaccinated for 1 person to receive a benefit.** (Comp. ¶56; Pedulla Dec. 38),

Regardless of which so-called Covid vaccine is taken, it now is well known that those receiving only two shots are not protected by those shots at all in terms of testing positive for SARS-2 or spreading SARS-2. (Comp. ¶57; Babich Dec. 42) Moreover, even those with two booster shots test positive for SARS-2, including Anthony Fauci, M.D., who is perhaps the greatest proponent in the world of the so-called vaccine, yet who twice tested positive for SARS-2 exposure, and who contracted COVID-19, after receiving two booster shots. (Comp. ¶58; Pedulla Dec. 42). Nor does being fully up to date with boosters prevent death, as the loss of former Secretary of State Colin Powell attests. (Comp. ¶59; Pedulla Dec. ¶42)

12

**E.  The So-Called COVID-19 Vaccines are not Safe.**

There have been a far greater number of vaccine-associated deaths reported to VAERS in 2021--during the first three quarters of the year only--than in any of the last 30 years in the operation of the VAERS system. **Fully half of the vaccine-related deaths that have ever been reported to VAERS *since 1990*, have occurred in 2021.** (Comp. ¶60; Pedulla Dec. 20). Normally, 120-150 total vaccine-related deaths are reported to VAERS *annually*. However, between December 14, 2020, when the Pfizer shot was rolled out, and July 6, 2022, VAERS has received reports of 15,380 deaths, which is over 800 deaths *per month.* (Comp. ¶61; Pedulla Dec. Exhibit 2b). Another way of understanding the potentially grave danger presented by the COVID-19 shots is that it has been reported that during the entire *twenty year* period of the Afghanistan and Iraq wars *combined*, through October 2021, a total of 7,054 United States Military forces were killed. *The number of reports of death received by VAERS in under two years is more than double that of the total deaths in the 20 year Afghanistan/Iraq wars combined.* (Comp. ¶61, **Ex. 11**). In additions to deaths, the CDC has received thousands of reports of COVID-19 shot injuries, many of which are serious, life-threatening, and life-altering, such as myocarditis, pericarditis, anaphylaxis, thrombosis with thrombocytopenia syndrome, and Guillain-Barré syndrome, among dozens of other injuries. (Comp.

13

¶63; Babich Dec. ¶22, **Ex. 3b, Ex. 10**).

According to OpenVAERS.com, a private organization that posts publicly available CDC/FDA data of injuries reported post-vaccination, it is believed that over the life of the VAERS system being in place, reporting is as low as 1%. But even if reporting has been at 50%, that would translate to over 30,000 deaths by the so-called COVID-19 vaccines in under two years. (Comp. ¶64, **Ex. 12**). Indeed, the plaintiffs' expert, Michael Babich, Ph.D., asserts that as a matter of scientific fact, COVID-19 shots are not actually vaccines at all in the traditional sense, and they are not capable of giving a person immunity from the SARS-2 virus, which is the virus that sometimes causes infected individuals to develop COVID-19, the disease. (Comp. ¶65; Babich Dec. 24-36). Instead, those receiving such purported vaccines will continually have to get booster shots to keep up with the ever-changing SARS-2 virus, while the unvaccinated will develop natural immunity, which multiple studies show to be superior to vaccine 'immunity'. (Comp. ¶65; Babich Dec. 36-48).

Under the circumstances, the compulsory proof of so-called COVID-19 vaccination, or of a PCR test, violates the statutory and constitutional rights of every person who wishes to enter a courthouse, including duly licensed attorneys in good standing, and adds an additional burden to such licensed attorneys in good standing, whose clients have every right to their attorney to be representing them in the presence of the Court, which is a right which was deeply imbedded in the fabric of

14

our nation at the time the Constitution was adopted, thus making it a fundamental right engrained in our First Amendment. Consequently, an injunction against enforcement of the Order must be entered, any such EUA COVID-19 vaccine or testing requirement must not be enforced in the future, and attorneys' fees and costs should be awarded to the plaintiffs. (Id. ¶67)

## LEGAL ARGUMENT

### POINT I

### THE ORDER VIOLATES THE STATUTE AND REGULATION AND, THUS, IS UNENFORCEABLE AND VOID.

The Order offers one of three choices for duly admitted attorneys: (1) it coerces individuals to accept a so-called COVID-19 vaccine if they have not already received such shot(s), which are only available because of their EUA status; (2) it coerces individuals to be tested with a completely unapproved PCR test; or (3) it punishes those who do neither by excluding them from District courthouses. Since the Order therefore is coercive and punitive, it violates the Statute and Regulation, and must be vacated.

As set forth above, all of the existing COVID-19 shots are available only through Emergency Use Authority pursuant to 21 U.S.C. § 300bbb, which specifies that each person must be informed **"of the option to accept or refuse administration of the product**, of the consequences, if any, of refusing administration of the product, and of

15

the alternatives to the product that are available and of their benefits and risks." The Statute further provides, at §(e)(1)(A)(ii), that its "conditions [are] designed to **ensure** that individuals to whom the product is administered are informed," of their rights. The FDA, whose powers over the regulation of drugs, vaccines, and therapeutics is ubiquitous, plainly did not intend for "consequences" to mean that medical providers must provide legal advice that the person refusing will not be allowed into a courthouse. Rather, the plain language when read in context means that the medical consequences must be explained.

Indeed, the FDA's "informed consent" regulation leaves no room to doubt that coercion of any kind is prohibited. The Regulation provides the following as being fundamental to informed consent (emphasis added): **"A statement that participation is voluntary, refusal to participate will involve no penalty or loss of benefits to which the subject is otherwise entitled, and the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled."** Only the Secretary of Health and Human Services is statutorily authorized to impose additional conditions for EUA vaccines. 21 U.S.C. 300-bbb(e)(1)(B).

Thus, the Order, which is coercive in nature, is prohibited by the Statute and Regulation. For such reasons, the Order is unenforceable and void.

16

## POINT II

## THE ORDER VIOLATES THE FIRST AMENDMENT.

The nation's legal history and tradition is rooted in the English common law. Making the freedoms created through the English common law permanent as constitutional fixtures was a primary object of the First Amendment's ratification, and extended into the realm of trial practice. The Order deprives member of the District Bar such rights, by compelling them to be vaccinated or tested in order to stand before the Court to argue causes, which violates the First Amendment.

In A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney Gen. of Mass., 383 U.S. 413, 429-30 (1966) (Douglas, J., concurring), Justice William O. Douglas documented the importance to our Founding Fathers of preserving our basic freedoms against government interference with the ratification of the First Amendment:

> To assume that English common law in this field became ours is to deny the generally accepted historical belief that 'one of the objects of the Revolution was to get rid of the English common law on liberty of speech and of the press.' Schofield, *Freedom of the Press in the United States*, 9 Publications Amer. Sociol. Soc., 67, 76.
>
> More specifically, it is to forget the environment in which the First Amendment was ratified. In presenting the proposals which were later embodied in the Bill of Rights, James Madison, the leader in the preparation of the First Amendment, said: 'Although I know whenever the great rights, the trial by jury, freedom of the press, or liberty of conscience, come in question in that body [Parliament], the invasion of them is resisted by able advocates, yet their Magna Charta does not

17

contain any one provision for the security of those rights, respecting which the people of America are most alarmed. The freedom of the press and rights of conscience, those choicest privileges of the people, are unguarded in the British Constitution.'"

The majority in <u>Alden v. Maine</u>, 527 U.S. 706, 733 (1999), expanded on the

concept of the Bill of Rights ensuring preservation of English common law freedoms

as follows:

> The text and the structure of the Constitution protect various rights and principles. Many of these, such as the right to trial by jury and the prohibition on unreasonable searches and seizures, derive from the common law. The common-law lineage of these rights does not mean they are defeasible by statute or remain mere common-law rights, however. They are, rather, constitutional rights, and form the fundamental law of the land.

Under English common law, barristers had a "right of audience" before the

court.

> The term 'barrister' likely comes from 'the bar' which is generally used in reference to the process of qualifying as a legal professional or to the legal profession in general. A barrister is a law student who has been 'called to the bar'. The term originated in the mid 16th century where the bar was quite literally a barrier or railing in an Inn of Court that separated 'benchers' (i.e. the senior members) from the rest of the hall. When a student who was a member of an Inn of Court reached a certain level in their study of the law they would be 'called to the bar'. The etymology of the word became confused after the 17th century. It became a popular assumption that the term referred to the bar or railing in a courtroom that denoted the area that was restricted to participants in a trial or hearing.

https://discover.hubpages.com/education/A-Brief-History-of-Barristers-the-Inns-of-Court.

The right of audience was discussed by Oklahoma Justice Opala in <u>Cities Serv. Co. v. Gulf Oil Corp.</u>, 1999 OK 16, ¶ 14 n.1(1999) (Opala, J., dissenting), as follows (emphasis added):

> When called to the bar of a court, lawyers in England are said to have a right to appear and be heard on behalf of clients. Their professional competence as forensic practitioners confers upon them what is known as *right of audience.* **An American lawyer's *interest in a granted right of audience is every bit as great as* that of a legal practitioner in the United Kingdom. Moreover, the former's license to practice, unlike that of the latter, also is protected by constitutional shields against impermissible government action.** *See* Johnson v. Board of Governors of Registered Dentists, 1996 OK 4 P19, 913 P.2d 1339, 1345; *see also id.* at 1350 (Opala, J., concurring).

Thus, it is clear that the right of an attorney to appear in court on behalf of his or her client is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." <u>Dobbs v. Jackson Women's Health Org.</u>, 142 S. Ct. 2228; 2022 U.S. LEXIS 3057 *148 (2022) (Thomas, J., Concurring).

While it is recognized that when content neutral, "government may impose reasonable restrictions on the time, place, or manner of protected speech," such restrictions must be "narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989)

The idea that the failure of an attorney to be vaccinated with an EUA vaccine suddenly qualifies as reason to bar an otherwise fully qualified and licensed attorney

19

from a District courtroom cannot be taken lightly. Video and phone conferences are no substitute for seeing the body language of one's adversaries, the witnesses, and the Judge, and to be so seen. Further, connecting with a jury entails seeing the jurors, watching them, studying their reactions, and reading their body language. If such was not the case, then there never would be reason to appear in court.

The Order denies some attorneys with the ability to so appear, while granting to it others who are 'favored' by possessing a vaccine card. Such bar to entry into the courthouse and, thus, the bar to the attorney's right to speak in the presence of the bar, creates inequities among attorneys and parties. One party being forced to 'appear' on the phone or on video against other attorneys who are appearing in person presents disadvantages which are not permissible under the First Amendment.

There is no legitimate governmental interest in keeping healthy attorneys out of the courthouse because they do not have vaccine cards, while potentially sick attorneys who are vaccinated yet possibly infected with SARS-2 or actually suffering with COVID-19 are still permitted to enter the court. One's vaccination status has absolutely no bearing scientifically on whether SARS-2 can or will be transmitted. Thus, the Order is not narrowly tailored to serve a significant governmental interest, such that it is void and must be vacated.

Moreover, when one's adversaries are in court, the attorney barred from court for being unvaccinated plainly is not competing on equal footing. As noted in Ne.

20

Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S.

656, 666 (1993):

> When the government erects a barrier that makes it more difficult for
> members of one group to obtain a benefit than it is for members of
> another group, a member of the former group seeking to challenge the
> barrier need not allege that he would have obtained the benefit but for
> the barrier in order to establish standing. The "injury in fact" in an
> equal protection case of this variety is the denial of equal treatment
> resulting from the imposition of the barrier, not the ultimate inability
> to obtain the benefit.

## POINT III

## THE ORDER VIOLATES THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT.

Mr. Berutti is a duly admitted member of the District Bar. His vaccination

status is not a qualification for such admission. However, he and all other similarly

situated persons are treated unequally because of such status, in violation of the

Equal Protection Clause of the Fourteenth Amendment. Particularly given the

known ineffectiveness of the EUA vaccines to stop transmission of SARS-2, and of

the vaccines to prevent infection with SARS-2, the Order is irrational and cannot

withstand scrutiny.

Our Supreme Court wrote, in Romer v. Evans, 517 U.S. 620, 633-34 (1996):

Central both to the idea of the rule of law and to our own Constitution's
guarantee of equal protection is the principle that government and each
of its parts remain open on impartial terms to all who seek its
assistance. "'Equal protection of the laws is not achieved through
indiscriminate imposition of inequalities.'" *Sweatt* v. *Painter*, 339 U.S.

629, 635 (1950) (*quoting* Shelley v. Kraemer, 334 U.S. 1, 22 (1948)). Respect for this principle explains why laws singling out a certain class of citizens for disfavored legal status or general hardships are rare. A law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense. "The guaranty of 'equal protection of the laws is a pledge of the protection of equal laws.'" Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 541 (1942) (*quoting* Yick Wo v. Hopkins, 118 U.S. 356, 369 (1886)).

The Romer Court added (at 634-35):

a second and related point is that laws of the kind now before us raise the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected. "If the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest." Department of Agriculture v. Moreno, 413 U.S. 528, 534 (1973). Even laws enacted for broad and ambitious purposes often can be explained by reference to legitimate public policies which justify the incidental disadvantages they impose on certain persons. ... [H]owever in making a general announcement that [here the unvaccinated and untested] ... shall not have any particular protections from the law, inflicts on them immediate, continuing, and real injuries that outrun and belie any legitimate justifications that may be claimed for it.

"A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." Eisenstadt v. Baird, 405 U.S. 438, 447 (1972). "[C]lassifications based on disability violate that constitutional command if they lack a rational relationship to a legitimate

governmental purpose." Tennessee v. Lane, 541 U.S. 509, 522 (2004). Particular deference is given to legislative enactments because they are fundamentally the acts of the people themselves in our democratic society. *See* Dobbs v. Jackson Women's Health Org., 142 S. Ct. 2228 (2022) ("The Constitution is neutral and leaves the issue for the people and their elected representatives to resolve through the democratic process in the States or Congress--like the numerous other difficult questions of American social and economic policy that the Constitution does not address.") Here, the issue in question is not legislative, but rather, is one of judicial creation. Our Courts have not given such equivalent deference to judicial enforcement of administrative orders. See, *e.g.,* Allen v. Debello, 861 F.3d 433, 440 n.31 (3d Cir. 2017) (surveying cases where Judges may be enjoined against enforcing bar membership requirements they have promulgated since they are acting in a nonadjudicative enforcement capacity).

It has become somewhat fashionable to discriminate against those who have refused to be vaccinated with a so-called COVID-19 vaccine, be it for religious, medical, or any other reason. While it may be a broad ambition to prevent the spread of COVID-19, especially where all experience is that those who are vaccinated still can contract SARS-2/COVID-19 and communicate it to others, the discrimination against the unvaccinated causes real, immediate, and continuing injuries that belie any legitimate justification that may be claimed for the rules which have been put in

23

place. Moreover, in light of  Statute and Regulation which precludes coercion or punishment of any kind for those not taking the EUA vaccines, which are the only ones available, the Order must be vacated due to its violating the Fourteenth Amendment's Equal Protection clause.

## CONCLUSION

For the foregoing reasons, a Declaratory Judgment should be entered which voids and vacates the Order, based on violations of the Statute, the Regulation, and for violations of the First and Fourteenth Amendments of the United States Constitution.

Respectfully yours,

MURRAY-NOLAN BERUTTI LLC

*Ronald A. Berutti*

By:_____

Ronald A. Berutti

Dated: July 20, 2022