## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RONALD A. BERUTTI and MURRAY-NOLAN BERUTTI LLC, On their own behalves and on behalf Of all other members admitted to the Bar of the United States District Court for the District of New Jersey, including those admitted *pro hac vice,*<br><br>    Plaintiffs,<br><br>v.<br><br>HONORABLE FREDA L. WOLFSON, U.S. Chief District Judge, District of New Jersey, in her judicial capacity, and WILLIAM T. WALSH, Clerk of the United States District Court for the District of New Jersey.<br><br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **CIVIL ACTION**<br><br><br><br><br>**Civ. No. 2:22-cv-4661 (SDW)(ESK)**<br><br>**AMENDED VERIFIED COMPLAINT** |

The plaintiffs, by and through their attorneys, Murray-Nolan Berutti LLC, with knowledge

of their own acts, and upon information and belief as to all others, complain of defendants as

follows:

## STATEMENT OF THE CASE

1.    This action is brought by the plaintiffs on their own behalves, and on behalf of all

similarly situated individuals and entities, seeking declaratory relief and injunctive relief against

Honorable Freda L. Wolfson, United States Chief District Judge for the District of New Jersey

("Judge Wolfson"), and the United States District Court for the District of New Jersey (the

"District"), or any other Federal Court nationwide in the United States, and further seeking to

prevent the continued enforcement of Standing Order 2021-08 of the District (the "Order"), which

was issued by Judge Wolfson on September 13, 2021, and Standing Order 2022-01, which was issued by Judge Wolfson on March 16, 2022 ("Amended Order").

2.      The Order violates 21 U.S.C. § 300bbb (the "Statute"), since all available so-called COVID-19 vaccines are Emergency Use Authorized ("EUA"), such that no person can be coerced to take such vaccines. Under the Food and Drug Administration's ("FDA") informed consent regulation, 45 C.F.R. § 45.116(b)(8) (the "Regulation"), a person refusing an EUA vaccine cannot be discriminated against.

3.      Further, the Order violates the plaintiffs' First and Fourteenth Amendment rights in that those members of the Bar who do not or cannot produce proof of having received a so-called COVID-19 vaccine, are denied entry into New Jersey federal courthouses such that they are deprived of  the right of audience before the court, which is protected by the First Amendment, and they otherwise are treated unequally with those possessing a vaccine card although the so-called COVID-19 vaccines do not prevent the transmission or contagion of the SARS-2 virus or of COVID-19. In fact, sick individuals who are vaccinated are not prohibited from entering the courthouse because they have a vaccine card, whereas healthy individuals, such as the plaintiff, was barred due to his not having a vaccine card.

4.      By tacitly seeking to coerce individuals to become vaccinated, and by punishing those who are not vaccinated, and by interfering with the rights of attorneys to fully advocate on their clients' behalves, the Order violates the Constitution and laws of the United States such that it may not be enforced; nor may any similar Order be enforced against attorneys seeking entry into courthouses in the United States District Court system.

5.      Moreover, the Order provides an "alternative" which permits individuals who do not have proof of so-called vaccination to show results of a negative PCR test, which test was also

2

EUA, but is no longer authorized by the FDA even for EUA use. Thus, the alternative to showing proof of vaccination is also illegal, unconstitutional, and potentially is dangerous. Thus, it cannot save the Order.

## THE PARTIES

6.      Ronald A. Berutti ("Mr. Berutti") is an individual who resides in Cranford, New Jersey. He is a licensed attorney who has been admitted to the District Bar since 1993.

7.      Murray-Nolan Berutti LLC ("MNB") is a New Jersey limited liability company with an office in Cedar Knolls, New Jersey.

8.      Judge Wolfson is the Chief Judge of the District who entered the Order which is applicable to the entire District.

9.      William T. Walsh is the Clerk of the United States District Court for the District of New Jersey (the "Clerk"), which is an Article III court under the United States Constitution with jurisdiction over the entire State of New Jersey, and is charged with administering all Court procedures, including those arising from the Order.

10.      The plaintiffs bring this case on their own behalves, and on behalf of all attorneys admitted to the Bar of the District and/or of any other District in the United States who is faced with similar vaccine and/or testing related restrictions on entry into Court.

## JURISDICTION AND VENUE

11.      The plaintiffs' claims are brought pursuant to 28 USC §§ 2201-02, as they arise from violations of the United States Constitution and seek declaratory and other relief, such that jurisdiction is appropriate, pursuant to 28 U.S.C. §§ 1331 and 1343.

12.      All plaintiffs reside in the District, and a substantial part of the events or omissions giving rise to the claims occurred in the District, and a substantial part of the property that is subject

of the action is situated in the District, such that venue is appropriate pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## FACT ALLEGATIONS

### A. The Plaintiffs are Barred from all U.S. District Courthouses in New Jersey Because of the Order and Amended Order.

13.     On June 6, 2022, Mr. Berutti was scheduled to appear in court within the District in Trenton. It was his first appearance in federal court since before the Covid-19 pandemic began on or about March 13, 2020.

14.     Mr. Berutti was confronted by U.S. Marshalls at the entrance of the building who asked whether Mr. Berutti could produce a vaccine card. Mr. Berutti did not produce one and gave no reason for not producing one.

15.     The U.S. Marshalls at the entrance then requested whether Mr. Berutti had a recent **PCR** test result, specifically, which he did not.

16.     When he arrived at the courthouse, Mr. Berutti was unaware of the Order and of the requirement that he produce a vaccine card or a negative PCR test.

17.     Mr. Berutti exhibited and had no symptoms of COVID-19 or any other communicable disease or illness when he entered the courthouse.

18.     Mr. Berutti was thereafter instructed to wait in his automobile and the Court would call him with instructions.

19.     Shortly after arriving in his automobile, Mr. Berutti received a call from Honorable Peter G. Sheridan, U.S.D.J., who advised that Mr. Berutti's two adversaries were in the courtroom, and that if Mr. Berutti had no objection, Judge Sheridan would entertain oral argument with his adversaries in the courtroom and Mr. Berutti remotely in his automobile.

4

20.     Mr. Berutti objected on grounds that the Order violated his Equal Protection rights under the 14th Amendment of the United States Constitution, and that the Order violated the Statute and the Regulation.

**B.  The Emergency.**

21.     Mr. Berutti and MNB have multiple cases pending in the U.S. District Court in New Jersey, and also have cases pending in other U.S. District Courts as well, including in the Eastern District of New York, the Southern District of New York, and the Southern District of Ohio, Western Division.

22.     The existence of standing orders which would prevent the plaintiffs from appearing in federal courthouses thus presents an emergency issue which requires expedited review and relief.

23.     The day after Mr. Berutti was prevented from entering the courthouse, a telephone conference was held by Judge Sheridan and all counsel in the subject legal action.

24.     When Mr. Berutti originally objected to being excluded from the courthouse, Judge Sheridan set a schedule for the plaintiffs to file a motion related to the Order in the subject legal action, Falcone v. Dickstein, 3:22-cv-921 (PGS)(TJB) (the "Action").

25.     During the phone conference, Judge Sheridan advised that since the Order was entered by Judge Wolfson, it would be necessary for the plaintiffs to raise the issue with Judge Wolfson.

26.     Judge Sheridan was specifically asked how to so proceed, and His Honor advised that he could not give Mr. Berutti guidance on such issue.

27.     Judge Sheridan also advised that Standing Order 2021-08 was the operative Order which had to be challenged.

28.     Over the course of the next several weeks, in addition to handling their normal caseload, the plaintiffs attempted to determine how such a challenge to the Order could be presented to Judge Wolfson, since there was no active litigation related to such Order, and since Judge Wolfson did not preside over the Action.

29.     Although it certainly was not the plaintiffs' preference to do so, and being mindful of *Fed. R. Civ. P.* 11, ultimately it was determined that a separate lawsuit seeking a declaratory judgment had to be filed against Judge Wolfson, since there appeared to be no other way in which standing would be conferred so as to challenge the Order.

30.     As a result, this lawsuit was filed challenging the Order, which was the specifically described operative Order at the time Mr. Berutti was barred from the courthouse.

**C.  The Order.**

31.     Among other things, the Order, a true copy of which is attached to the original Complaint as **Exhibit 1**, and is incorporated herein by reference, requires that attorneys and others visiting courthouses within the District provide "[a]cceptable proof of vaccination" against COVID-19.

32.     Alternatively, the Order permits entry upon "proof of a negative result from a PCR test (not a rapid test) taken no more than 72 hours prior to seeking entry…"

33.     Upon information and belief, other U.S. District Courts have similar Orders in place which similarly violate the rights of duly admitted members of the Bar for such districts, such that they also are unconstitutional and illegal.

**D.  The Statutory Prohibition of the Order.**

34.     All or virtually all presently available purported COVID-19 vaccines are available only because they have received EUA approval by the FDA pursuant to the Statute.

6

35.    PCR tests likewise had been authorized by the FDA as EUA.

36.    Effective January 1, 2022, such EUA approval was withdrawn, such that PCR tests are no longer authorized for use in testing for the SARS-CoV-2 virus, which sometimes causes COVID-19.  (See true copy of www.cdc.gov web page dated July 21, 2022 attached to the original Complaint as **Exhibit 4**).

37.    Although the FDA has given full, unconditional approval for two COVID-19 vaccines, those two being Pfizer's Comirnaty and Moderna's Spikevax, neither such vaccine is presently being manufactured or otherwise is available to the public except, possibly, in extremely limited quantities.  (See **Exhibit 5**, a true copy of the FDA approval letter for Comirnaty, dated August 23, 2021; **Exhibit 6**, a true copy of "Fact Sheet for Healthcare Providers Administering Vaccine," revised as of September 22, 2021; and **Exhibit 7**, the "Purple Book Database of Licensed Biological Products," related to Comirnaty; **Exhibit 8**, FDA EUA authorization for Moderna booster;[1] and **Exhibit 9**, Daily Med, demonstrating that Pfizer does not plan to produce Comirnaty, all of which are to the original Complaint and incorporated herein by reference).

38.    Indeed, if Comirnaty and Spikevax were being manufactured and were generally available to the public, then pursuant to the Statute, Pfizer, Moderna, and Johnson & Johnson would no longer be permitted to distribute their EUA authorized vaccines, as non-EUA vaccines would be available for use.

39.    If non-EUA vaccines were made available, then these pharmaceutical manufacturers would lose their immunity for use.

---

[1] In particular, the Court should note footnote 16 of **Exhibit 8** to the original Complaint, which is incorporated herein by reference, which provides that "there is not sufficient approved vaccine available for distribution."

40.     Pursuant to the Statute's "informed consent" provision, any person given the option to take an EUA product, be it a vaccine, a drug, or a therapy, has an absolute right to refuse such EUA product.

41.     Pursuant to the Regulation: **"A statement that participation is voluntary, refusal to participate will involve no penalty or loss of benefits to which the subject is otherwise entitled, and the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled,"** is required whenever an individual is offered a  so-called COVID-19 vaccine.

42.     Since only EUA vaccines are available, the Order cannot coerce or penalize those who refuse vaccination, who refuse to produce a vaccine card, or those who refuse to take an unauthorized PCR test.

### E.  The So-Called COVID-19 Vaccines are not Effective.

43.     Moreover, the purported vaccines are neither safe nor effective based on traditional metrics of safety and effectiveness.

44.     In 2017, the FDA published proposed guidance as to truth in advertising which would have required that if a product's effectiveness is to be advertised, the pharmaceutical company should base such effectiveness on the Absolute Risk Reduction ("ARR") of the product, which is a percentage of those receiving a benefit from the product as measured against the entire population of those administered the product in the pharmaceutical study.   Attached is the Declaration of Dominic Pedulla, M.D., which is incorporated herein by reference ("Pedulla Dec", to the original Complaint as **Exhibit 2**).  A true copy of an article from the U.S. Department of Health an Human Services, Food and Drug Administration, published October 2018, "Presenting

Quarantine Efficacy and Risk Information in Direct-to-Consumer Promotional Labeling and Advertisements," is attached to the original Complaint as **Exhibit 2c**.

45.     In such proposed guidance, the FDA suggested that for proof of effectiveness, the Relative Risk Reduction ("RRR") should not be used or, if used, should be compared to the ARR. (See **Exhibit 2c**).

46.     The RRR merely compares the number of people in the study receiving a benefit from the product against those in the study who were not administered the product.  Therefore, in the Covid-19 testing studies of the so-called Covid-19 vaccines, the RRR was a measurement merely of those who were <u>not</u> administered the so-called vaccine, and who thereafter tested positive for SARS-2 in greater numbers as compared to those who received the so-called vaccine.

47.     The so-called COVID-19 vaccines that have been approved for EUA, according to the pharmaceutical companies' own published trial data, all had a very low possibility of providing a personal benefit to individuals in general even in optimal, pre-variant, circumstances. As will be detailed below, variants make the so-called vaccines even less effective and, perhaps, completely worthless.

48.     More specifically, the studies of the three available EUA shots were commonly being touted as being around 95% effective, which was the RRR. However, that ARR for each was below 2%, and for Pfizer it was below 1% in its own published data.

**(i)     The Pfizer study.**

49.      A true copy of an article published in the <u>New England Journal of Medicine</u>, published December 10, 2020, titled <u>Safety and Efficacy of BNT162b2 mRNA Covid-19 Vaccine</u>, which details the results of Pfizer's Phase 3 study of its commonly available EUA vaccine is attached as **Exhibit 2e**.

50.     On page 2, under "Results" the authors note that there was a total of 43,548 participants in the study, all of whom received injections. 21,720 received the Pfizer vaccine, and the remaining 21,728 received a placebo.

51.     Of the 21,720 participants who received the so-called vaccine, only 8 came down with cases of COVID-19 at least 7 days after the second dose. Of those receiving the placebo, only 162 cases of COVID-19 were reported after at least 7 days.

52.     **Relative to placebo**, there were 154 fewer cases of COVID-19 among those injected with the Pfizer shot versus those receiving placebo. Thus, the RRR is calculated as 154/162, or 95%.  Such percentage is the commonly used "effectiveness" percentage which is purported to the general public.

53.     However, **the Pfizer ARR--meaning the percentage of people actually benefitting from the Pfizer vaccine across the entire population of those receiving the shot in the study--is calculated at 154/21,270, or a mere 0.73% (rounding up) effectiveness rate.**

54.     Another way of looking at this number is that **more than 138 individuals must be vaccinated for 1 person to receive a benefit** from the vaccine (21,270/154).

55.     Thus, the Pfizer vaccine, under the optimal pre-variant circumstances of the time, was barely effective at all in terms of actually reducing the risk that a person receiving the shot **actually** would receive a benefit from the shot.  These calculations are from use of Pfizer's <u>own provided data</u>.

### (ii)      The Moderna study.

56.     Attached to the Pedulla Dec. as **Exhibit 2f** is a true copy of an article, published December 30, 2020, from the <u>New England Journal of Medicine</u>, titled "Efficacy and Safety of the mRNA-1273 SARS-CoV-2 Vaccine".

57.    The article details that of the total of 30,420 participants in the study was broken down into equal numeric groups of 15,210 participants, half who received the Moderna shot, and the other half who received a placebo.

58.    Of those injected with the Moderna shot, only 11 participants came down with Covid-19 after at least 14 days. Of those receiving a placebo, only 185 participants came down with Covid-19. Consequently, a total of 174 people benefitted from the Moderna shot (185-11), when compared relatively to placebo. Thus, the highly discussed RRR benefit of the vaccine is calculated as 174/185, or 94%.

59.    However, **the ARR is calculated as 174/15,210, or 1.15% (again, giving Moderna the benefit of the doubt, and rounding up).**

60.    Another way of looking at this is that **more than 87 people have to be vaccinated for 1 person to receive a benefit**. (15,210/174).

    **(iii)    The Johnson & Johnson study.**

61.    Attached to the Pedulla Dec. as **Exhibit 2g** is a true copy of an article published on June 10, 2021, in the New England Journal of Medicine, titled "Safety and Efficacy of Single-Dose Ad26.COV2.S Vaccine against Covid-19".

62.    Johnson & Johnson injected 19,630 participants with their shot, and 19,681 with placebo.

63.    Relative to those receiving placebo, a total of 116 of those who were vaccinated contracted Covid-19 within at least 14 days thereafter, compared to 348 in the placebo group. Thus, 232 people injected with the vaccine benefitted from receiving the vaccine (348-116). Consequently, the RRR for the Johnson & Johnson vaccine is calculated as 232/348, or 67% (rounding up).

11

64.     After at least 28 days, 66 of those receiving the vaccine tested positive for SARS-2, while 193 cases were recorded in the placebo group, thus constituting a net relative benefit to 127 people (193-66). Thus, after at least 28 days, the RRR for the Johnson & Johnson vaccine is calculated as 127/193, or 66% (rounding up).

65.     Giving Johnson & Johnson the full benefit of the doubt by adding the 14 and 28 day beneficial recipient number together (232+127), the Johnson & Johnson shot provided an actual benefit to 359 individuals. Thus, **ARR--the percentage of people who received that shot who actually received a benefit from receiving the vaccine--is calculated as 359/19,630, or 1.83%.**

66.     Another way of looking at these numbers is that more **than 54 people have to be vaccinated for 1 person to receive a benefit.**

67.     Regardless of which so-called Covid vaccine is taken, it now is well known that those receiving only two shots are not protected by those shots at all in terms of testing positive for SARS-2 or spreading SARS-2.

68.     Moreover, even those with two booster shots test positive for SARS-2, including Anthony Fauci, M.D., who is perhaps the greatest proponent in the world of the so-called vaccine, yet who twice tested positive for SARS-2 exposure, and who contracted COVID-19, after receiving two booster shots.

69.     Indeed, on July 21, 2022, it was announced that President Joseph R. Biden had contracted COVID-19.

70.     President Biden is a proponent of the so-called COVID-19 vaccines and boosters who claims to have received two doses of COVID-19 shots and two boosters, yet now is in quarantine to avoid causing spread as he attempts to recover from the illness.

71.     Being fully up to date with boosters does not prevent death, as the loss of former Secretary of State Colin Powell attests.

**F.   The So-Called COVID-19 Vaccines are not Safe.**

72.     There have been a far greater number of vaccine-associated deaths reported to the Vaccine Adverse Effects Reporting System (VAERS) in 2021--during the first three quarters of the year only--than in any of the last 30 years in the operation of the VAERS system. **Fully half of the vaccine-related deaths that have ever been reported to VAERS since 1990, have occurred in 2021.** *See* Pedulla Dec. at **Exhibit 2b**.

73.     Normally, 120-150 total vaccine-related deaths are reported to VAERS *annually*. However, between December 14, 2020, when the Pfizer shot was rolled out, and July 6, 2022, VAERS has received reports of 15,380 deaths which, extrapolated, is over 800 deaths *per month.* (attached to the original Complaint as **Exhibit 10**, and incorporated herein by reference)

74.     Another way of understanding the potentially grave danger presented by the COVID-19 shots is that it has been reported that during the entire *twenty year* period of the Afghanistan and Iraq wars combined, through October 2021, a total of 7,054 United States Military forces were killed. The number of reports of death received by VAERS in *under two years is more than double that of the Afghanistan/Iraq wars* (attached to the original Complaint as **Exhibit 11,** incorporated herein by reference).

75.     In additions to deaths, the CDC has received thousands of reports of COVID-19 shot injuries, many of which are serious, life-threatening, and life-altering, such as myocarditis, pericarditis, anaphylaxis, thrombosis with thrombocytopenia syndrome, and Guillain-Barré syndrome, among dozens of other injuries. (**Exhibit 10**)

76.     According to OpenVAERS.com, a private organization that posts publicly available CDC/FDA data of injuries reported post-vaccination, it is believed that over the life of the VAERS system being in place, reporting is as low as 1%. But even if reporting was at 50%, that would translate to over 30,000 COVID-19 shot deaths in under two years (attached to the original Complaint as **Exhibit 12** and incorporated herein by reference**).**

77.     Indeed, the plaintiffs are presenting an expert who asserts, as a matter of scientific fact, that COVID-19 shots are not actually vaccines at all in the traditional sense, and they are not capable of giving a person immunity from the SARS-2 virus, which is the virus that sometimes causes infected individuals to develop COVID-19, the disease, as is detailed in the accompanying Declaration of Michael Babich, which is incorporated herein by reference. Instead, those receiving such purported vaccines will continually have to get booster shots to keep up with the ever-changing SARS-2 virus, while the unvaccinated will develop natural immunity, which multiple studies show to be superior to vaccine 'immunity'.  See Declaration of Michael Babich, Ph.D., incorporated herein by reference ("Babich Dec") attached to the original Complaint as **Exhibit 3**, and incorporated herein by reference.

78.     Pursuant to Dr. Babich, the requirement of blanket vaccination is flawed, as mimicked vaccination and artificial immunity leads to a worse response than natural immunity, and vaccination has led to persistent physiological effects from damaging RNA into otherwise health human cells.  (See **Exhibit 3**, paras 20-23 et seq.).

79.     Under the circumstances, the compulsory proof of so-called COVID-19 vaccination, or of a PCR test, violates the statutory and constitutional rights of every person who wishes to enter a courthouse, including duly licensed attorneys in good standing, and adds an additional burden to such licensed attorneys in good standing, whose clients have every right to

14

their attorney to be representing them in the presence of the Court, which is a right which was deeply imbedded in the fabric of our nation at the time the Constitution was adopted, thus making it a fundamental right. Consequently, an injunction against enforcement of the Order must be entered, any such EUA COVID-19 vaccine or testing requirement must not be enforced in the future, and attorneys' fees and costs should be awarded to the plaintiffs.

**G. Decision on the Initial Emergent Application.**

80.     On July 20, 2022, the initial Verified Complaint in this matter was filed with an Order to Show Cause seeking temporary restraints.

81.     On July 21, 2022, Honorable Susan D. Wigenton, U.S.D.J. reviewed and denied the application. A true copy of the Decision and Order ("Decision") is attached hereto as **Exhibit 13**.

82.     Besides technical service issues that had not been complied with (and which are being corrected with this submission), Judge Wigenton noted that the Order had been amended by Standing Order 2022-01, dated March 16, 2021, which provided for rapid testing as an alternative to the PCR test.

83.     As with the so-called COVID-19 vaccines and the PCR test prior to its EUA being withdrawn, all rapid tests also are only available because they are authorized pursuant to the Statute with EUA designation. Thus, the same way that the Statute precludes coerced vaccination, so to does the Statute preclude coerced rapid testing.

84.     Attached hereto as **Exhibit 14** are FDA documents setting forth EUA approval information with respect to all COVID tests which presently are available to individuals.

85.     No evidence exists that any test for the SARS-2 virus is fully FDA approved, such that only EUA tests are available.

15

86. Further, since both vaccinated and unvaccinated individuals may transmit and contract the SARS-CoV-2 virus, such that only requiring unvaccinated individuals to provide a negative test of any kind is irrational and violates the Fourteenth Amendment's Equal Protection clause.

87. Moreover, Judge Wigenton found that no emergency was stated since the declination of an alternative is not evidence of exigency. However, since the rapid tests also may not be coerced, the exigency exists despite the new alternative permitted by the Amended Order.

88. Given that Mr. Berutti may be precluded from any and all courtroom activities based on the Standing Orders in question, and since his First Amendment, Fourteenth Amendment, and informed consent rights under the Statute have been violated and may continue to be violated at any time he is called to a federal courthouse, exigent circumstances exist with respect to him, personally.

89. Moreover, since this action is brought not only on his behalf, but also on all similarly situated attorneys, the injury likely is faced by District attorneys daily.

90. Further, since a national injunction is being sought, and practitioners throughout the nation face similar or identical restrictions on their constitutional and statutory rights, the harm is exigent. One such requirement is included in the document attached hereto as **Exhibit 15** at paragraph 17 thereof.

91. Since the deprivation of constitutional rights always presents irreparable harm, it is alleged that this matter is exigent in nature.

## **FIRST COUNT**
### **(28 U.S.C. § 2201: Declaratory Judgment)**

92.     The plaintiffs repeat and reassert each and every allegation above, as if fully set forth herein at length.

93.     At all pertinent times, Judge Wolfson was a state actor who was acting under color of law when promulgating and enforcing the Order.

94.     At all pertinent times, the Clerk was a state actor which was acting under color of law in enforcing the Order.

95.     As a licensed and duly qualified member of the Bar, Mr. Berutti individually, and through MNB, has a First Amendment right under the United States Constitution, to stand and appear before the Court to argue and to be heard on behalf of his clients and those of MNB.

96.     As licensed member of the Bar, Mr. Berutti individually, and through MNB, has the Constitutional right to be treated equally with every other member of the Bar provided that he is in good standing.

97.     MNB has rights under the First and Fourteenth Amendment to have its duly licensed and qualified attorneys to stand and appear before the Court without discrimination based on their vaccination or testing status, at least as related to EUA vaccines and tests.

98.     At all pertinent times, Mr. Berutti was in a member of the District Bar who was in good standing, exhibited no signs of illness, and was not ill.

99.     The ability to stand and appear in court to advocate for a client is fundamental to the nature of our system of justice and predates the United States Constitution itself.

100.    Historically, prior to adoption of the Constitution, barristers of the common law English system had a "right of audience" before a Court so that they could advocate for their clients.

101.    The first Bar for lawyers in the United States is believed to have been established in 1761 in Massachusetts and allowed those who were properly trained and who adhered to a code of ethics to advocate for individuals in Court. The health status of member of the Bar was not a qualification to appear and practice.

102.    The First Amendment of the United States Constitution, at the time of its adoption, was intended to preserve such right, together with other rights permitted under English Common Law, as being inviolable.

103.    Depriving the plaintiffs and, through them, their clients, the ability to stand, appear and be heard in Court on an equal footing with adversaries, therefore must be the subject to the strictest scrutiny, which does not exist in the present circumstances.

104.    Depriving the plaintiffs, and through them, their clients, the ability to stand, appear, and be heard in Court is a deprivation of the First Amendment right to free speech and the freedom of expression before the Court.

105.    The disparate treatment of the plaintiffs and all those similarly situated by the conduct of the defendants is purposefully discriminatory and violates the Fourteenth Amendment's Equal Protection Clause for the plaintiff and for all such similarly situated individuals.

106.    Those who are fully 'vaccinated and boosted' are capable of spreading, contracting, and even dying from the COVID-19 illness caused by the SARS-2 virus.

107.    The "COVID-19 vaccination" and/or negative rapid test status on which the Order is based is arbitrary and illegal per federal statute, and does not serve a compelling governmental

interest, such that its promulgation and enforcement improperly discriminates against the plaintiffs and violates the plaintiffs' rights to free speech and equal protection under the law.

108.    An actual controversy exists over which this Court has jurisdiction.

WHEREFORE, the plaintiffs demand Judgment in their favor and against the defendants as follows:

A.  Declaring the Order and Standing Order 01-2022 to violate 21 U.S.C. 300bbb such that it is null and void;

B.  Declaring the Order and Standing Order 01-2022 to violate 45 C.F.R. § 45.116(b)(8) such that it is null and void;

C.  Declaring the Order and Standing Order 01-2022 to violate U.S. Const., *amend* 1, such that it is null and void;

D.  Declaring the Order and Standing Order 01-2022 to violate U.S. Const., *amend*. 14, such that it is null and void;

E.  Declaring that no person may be compelled or coerced into the use of a "PCR" test for exposure to SARS-CoV-2;

F.  Declaring that no person may be compelled or coerced into the use of a "rapid test" for exposure to SARS-CoV-2;

G.  Declaring that no person may be punished or otherwise discriminated against for refusing to take a PCR test for SARS-CoV-2;

H.  Declaring that no person may be punished or otherwise discriminated against for refusing to take a rapid test for SARS-CoV-2;

I.  Declaring that no evidence exists that a fully FDA approved COVID-19 vaccine is available to the general public;

J.  Declaring that no person may be compelled or coerced into being injected with a COVID-19 vaccine, to take a PCR test for SARS-CoV-2, or to take a rapid test for SARS-CoV-2, in order to enter a United States Courthouse or to participate in proceedings therein;

K.  Declaring that all persons entering United States Courthouses should maintain appropriate vigilance if they believe themselves to have been exposed to the SARS-CoV-2 virus or any other communicable virus or disease which may present an unreasonable danger to others, and should self-report their need or desire to quarantine as a result thereof;

L.  Declaring that the Pfizer, Moderna, and Johnson & Johnson COVID-19 shots are not safe or effective;

M.  Awarding the plaintiffs legal fees and all costs of suit;

N.  Awarding such other and further relief as is equitable and just.

**MURRAY-NOLAN BERUTTI LLC**

*s/ Gwyneth K. Murray-Nolan*

By:_____

Gwyneth K. Murray-Nolan
100 E. Hanover Avenue, Suite 401
Cedar Knolls, New Jersey 07927
(908) 588-2111
gwyneth@murray-nolanberutti.com

Dated: July 25, 2022

20

## **VERIFICATION**

RONALD A. BERUTTI, of full age, verifies the following under penalty of perjury:

I am the plaintiff in the within matter. I have reviewed the Complaint and know the contents thereof, which I know to be true, except with respect to those acts which are not my own, which I believe to be true.

_____
Ronald A. Berutti

Dated: July 25, 2022