## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RONALD A. BERUTTI and | ) | **CIVIL ACTION** |
| MURRAY-NOLAN BERUTTI LLC, | ) | |
| On their own behalves and on behalf | ) | |
| Of all other members admitted to the | ) | |
| Bar of the United States District Court | ) | |
| for the District of New Jersey, | ) | |
| including those admitted *pro hac vice,* | ) | **Civ. No. 2:22-cv-04661 (SDW)(ESK)** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HONORABLE FREDA L. | ) | |
| WOLFSON, U.S. Chief District Judge, | ) | |
| District of New Jersey, in her judicial | ) | |
| capacity, and The UNITED STATES | ) | |
| DISTRICT COURTFOR THE DISTRICT | ) | |
| OF NEW JERSEY | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

## PLAINTIFF'S BRIEF IN SUPPORT OF ORDER TO SHOW CAUSE
## FOR PRELIMINARY INJUNCTION

---

**MURRAY-NOLAN BERUTTI LLC**
100 E. Hanover Avenue, Suite 401
Cedar Knolls, New Jersey 07927
Phone: 908-588-2111
ron@murray-nolanberutti.com
Attorney for Plaintiffs

On the Brief:
Ronald A. Berutti – N.J. Atty ID No. 023361992

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 7

LEGAL ARGUMENT.................................................................................................... 21

POINT I:  THE ORDER VIOLATES THE STATUTE OF REGULATION, AND THUS, IS UNENFORCEABLE AND VOID........................................................................... 21

POINT II: THE ORDER VIOLATES THE FIRST AMENDMENT  . ........................................ 23

POINT III: THE ORDER VIOLATES THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT  ............................................................................... 27

POINT IV: A TEMPORARY RESTRAINING ORDER SHOULD BE GRANTED  ............... 31

CONCLUSION............................................................................................................... 40

# TABLE OF AUTHORITIES

**Page**

**Cases**

*A Book Named "John Cleland's Memoirs of a Woman of Pleasure"*
   *v. Attorney Gen. of Mass.*, 383 U.S. 413, 429-30 (1966) ....................................... 23

*Alden v. Maine*, 527 U.S. 706, 733 (1999). ................................................................. 24

*Allen v. Debello*, 861 F.3d 433, 440 n.31 (3d Cir. 2017) ............................................ 29

*Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir.

   2010) ................................................................................................................ 34, 35

*Cities Serv. Co. v. Gulf Oil Corp.*, 1999 OK 16, ¶ 14 n.1(1999) ............................... 25

*Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351,

   359 (3d Cir. 1980) ........................................................................................... 34, 35

*Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973)............................... 28

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228; 2022 U.S.

   LEXIS 3057 *148 (2022) ............................................................................... 25, 29

*ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) ................................... 34

*Eisenstadt v. Baird*, 405 U.S. 438, 447 (1972) ........................................................... 28

*Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins.*

   *Co.*, 582 F.3d 721, 725 (7th Cir. 2009) ................................................................. 34

*Johnson v. Board of Governors of Registered Dentists*, 1996 OK 4
   P19, 913 P.2d 1339, 1345 ..................................................................................... 25

*Mallet & Co. v. Lacayo*, 16 F.4th 364, 380 (3rd Cir. 2021) ......................... 34

*Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010) ................................. 34

*Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) ...................................... 33

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ................................................ 29

*Reilly v. City of Harrisburg*, 858 F.3d 173, 179 & n.3 (3d Cir. 2017)
 . ..................................................................................... 34

*Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020)) . ................... 32

*Romer v. Evans*, 517 U.S. 620, 633-34 (1996) . ................................ 27, 28

*Shelley v. Kraemer*, 334 U.S. 1, 22 (1948) ...................................... 27

*Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942).............. 28

*Sweatt* v. *Painter*, 339 U.S. 629, 635 (1950)................................ 27, 28

*Tennessee v. Lane*, 541 U.S. 509, 522 (2004)................................... 28

*Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). ...................... 25

*Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) . ............................... 33

*Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) ............................... 28

## STATUTES

21 U.S.C. § 300bbb.......................................................... 4, 21

21 U.S.C. § 300bbb-3(c)(3)-(4) ................................................. 4

21 U.S.C. § 300bbb-(e)(1)(B) .................................................. 22

45 C.F.R. § 45.116(b)(8)........................................................................................................... 4

§564(e)(1)(A)(ii) ................................................................................................................ 4, 22

## **PRELIMINARY STATEMENT**

Before the Court is a second effort at obtaining a temporary restraining order and preliminary injunction seeking to halt enforcement of administrative Standing Orders entered by Honorable Freda L. Wolfson, United States Chief District Judge for the District of New Jersey ("Judge Wolfson") entered as Standing Order 2021-08 of the District (the "Order"), which compelled those seeking entry in the courthouses within the District of New Jersey ("District") either to present a vaccine card, or to have a recent negative PCR test, and now Standing Order 2022-01, entered March 16, 2022 ("Amended Order"), which permits an attorney to show a negative rapid test before entry to the courthouse. Defendant William T. Walsh is the Clerk of the District Court and is charged with carrying out the Order and Amended Order.

The plaintiffs have filed an Amended Verified Complaint which they believe addresses the concerns raised in this Court's Decision which denied the initial Order to Show Cause application. The plaintiffs recognize the gravity of the action they have filed and have done so with as great deference and restraint as is possible under the circumstances, while still pursuing the relief to which they believe they are entitled under the Constitution and laws of the United States. The plaintiff Ronald Berutti ("Mr. Berutti") was told that the Order was the operative Standing Order when he was kept from entry into the courthouse on June 6, 2022, and was told that

the issue had to be raised with Judge Wolfson. But how? There was not a legal case on the docket which gave the plaintiffs standing to move before Judge Wolfson with respect to Her Honor's Order. After much examination and deliberation, while also running a busy law practice, it was determined that the only way to seek review of the Order (and now, the Amended Order) was by filing this action seeking a declaratory judgment.

The plaintiffs also understand that many millions of Americans and individuals worldwide faithfully adhere to the adage that the so-called COVID-19 vaccines are "safe and effective," a mantra repeated over and over without any context in our newscasts, in advertisements, and in general conversation. However, the plaintiffs have brought forth substantial and scientific proofs that the shots (1) are not safe by historical standards and, in fact, are highly dangerous by such standards; (2) that they are ineffective both based on the pharmaceutical manufacturers' own data which led to Emergency Use Authority of the shots and based on factual observation--with some of the greatest proponents of the shots, including Dr. Anthony Fauci and President Joseph R. Biden recently being diagnosed with COVID-19, despite receiving two shots and two boosters.

Thus, this lawsuit challenges the Court to put aside the mass of data to which it may have been exposed to date; to put aside opinions about the shots (which are very hard not to have, given the state of the world since March 13, 2020); and to put

aside the reality that this Court is being called on to judge an Order of a highly respected Chief Judge of the same Court.[1] However, as Winston Churchill is alleged to have once said, "Courage is what it takes to stand up and speak; courage is also what it takes to sit down and listen."  We respectfully assert that this lawsuit calls on both the plaintiffs and this Court to exhibit the types of courage to which Churchill was referring if a just and correct result is to be reached in this case. That is because the plaintiffs are advocating for relief which places them in the center of controversy in order to vindicate their rights; and because this Court is being asked to discard all prior information it may have; and to discard all consideration as to against whom it is that the relief is being sought. The plaintiffs respectfully assert that the evidence in their favor is actually overwhelming, such that the just and correct determination at the conclusion of this case will be that the subject Orders are nullified, that a national injunction against such Orders is appropriate, and that related relief should be granted in the plaintiffs' favor regarding the so-called COVID-19 vaccines and the tests related to the SARS-CoV-2 virus.

At the time the Order was promulgated, and at present, all or virtually all available so-called COVID-19 vaccines are available only because the U.S. Food and Drug Administration ("FDA") has granted them Emergency Use Authority

---

[1] Indeed, we believe it to be a reasonable question as to whether another Judge of the District of New Jersey is not conflicted in making a determination as to whether the two Standing Orders in question herein of the Chief Judge of the District are unconstitutional and illegal under federal statutes and regulations.

3

("EUA") pursuant to 21 U.S.C. § 300bbb (the "Statute"). EUA status may only be permitted when there is "no adequate, approved, and available alternative to the product." 21 U.S.C. § 360bbb-3(c)(3)-(4). Both Pfizer and Moderna have full FDA approval for COVID-19 vaccines, but neither is manufacturing the approved vaccines, such that only the EUA vaccines are available. Evidence of this includes that Johnson & Johnson, which does not have a fully FDA approved COVID-19 vaccine, continues to have its EUA vaccine available, meaning that there remains "no adequate, approved, and available alternative" to its EUA product, as a matter of law.

The Statute provides, in sub-§ (III), that individuals must be apprised **"of the option to accept or refuse administration of the product**, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks." The Statute further provides, §564(e)(1)(A)(ii), that its "conditions [are] designed to **ensure** that individuals to whom the product is administered are informed," of their rights.

Moreover, the FDA's "informed consent" regulation leaves no room to doubt that coercion of any kind is prohibited. 45 C.F.R. § 45.116(b)(8) (the "Regulation") provides the following as being fundamental to informed consent (emphasis added):

**"A statement that participation is voluntary, refusal to participate will involve no penalty or loss of benefits to which the subject is otherwise entitled, and the**

**subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled."**

The plaintiff was barred from entry into the District's Trenton courthouse on June 6, 2022. The ban violates the Statute and the Regulation since it punishes those not coerced into vaccination with an EUA vaccine. The Order tacitly would coerce the plaintiff and those similarly situated, both in the District and in other Districts, to be vaccinated, take a PCR test which is not approved for use for COVID-19 at all, or take a rapid test, all of which are only EUA approved. Such Orders thus violate the Statute and Regulation and are unenforceable and void.

Moreover, as a member in good standing of the District Bar, due to the Order, Mr. Berutti was and continues to be denied his rights under the First and Fourteenth Amendments of the United States Constitution. Regarding the First Amendment violation, the long-established common law "right of audience" with the Court evidences an intent that licensed and otherwise qualified attorneys, such as Mr. Berutti, must be permitted to stand before the Court and argue cases on behalf of his clients as part of the First Amendment.  Mr. Berutti, and through him MNB, was denied such First Amendment right because of the Order. It is unprecedented that attorneys are barred from exercising such fundamental right--one which goes to the heart of our system of government, given the importance of the proper functioning adversarial system and the protection of liberty--based on vaccination status. The

Order fails to satisfy the strict scrutiny standard that must be applied to the denial of such enumerated constitutional right and, thus, must be vacated.

Further, Mr. Berutti and those similarly situated are denied the equal protection of the laws by virtue of the Order, since a new qualification is added to their right and ability to advocate for their clients which, again, is unprecedented. Moreover, not only do coercive measures violate the Statute, but the science reveals that the vaccines are neither effective for over 98% of individuals receiving the shots even in optimal circumstances, nor that they are safe, given that *more than twice as many deaths have been reported to the U.S. Centers for Disease Control ("CDC") via its Vaccine Adverse Events Reporting System ("VAERS") than as having occurred because of the so-called COVID-19 vaccines than occurred among all of the United States military during the entirety of the Afghanistan and Iraq wars combined.* It is not that vaccines per se are dangerous; however, these particular shots, scientifically, are unlike traditional vaccines as is demonstrated by the plaintiffs, and are actually making Covid worse. Thus, to coerce attorneys in our federal courts to become 'vaccinated' with these experimental shots which are neither safe nor effective scientifically or in the historical sense, is completely irrational and dangerous, as the Order exposes attorneys to great harm or death with such coercion.

Additionally, since both those who have received the shots, including all

boosters (such as Dr. Fauci and President Biden) are not inoculated against COVID-19, and may also spread COVID-19, the Amended Order which only requires unvaccinated attorneys to produce a negative test is irrational, and has no scientific basis or basis in common and observable experience. Rather, a favored class of attorneys has been created--those who have received the so-called COVID-19 vaccines--when there is no legitimate basis for such special classification of attorneys.

## STATEMENT OF FACTS

### A. The Plaintiffs are Barred from the Courthouse Because of the Order.

On June 6, 2022, Mr. Berutti was scheduled to appear in court within the District in Trenton. (Comp. ¶13). It was his first appearance in federal court since before the COVID-19 pandemic began subjecting the courts to closure, on or about March 13, 2020. (Id.) Mr. Berutti was confronted by U.S. Marshalls at the entrance of the building who asked whether Mr. Berutti could produce a vaccine card. Mr. Berutti did not produce one and gave no reason for not producing one. (Id. ¶14). The U.S. Marshalls at the entrance then requested whether Mr. Berutti had a recent PCR test result, specifically, which he did not. (Id. ¶15). When he arrived at the courthouse, Mr. Berutti was unaware of the Order and of the requirement that he produce a vaccine card or a negative PCR test. (Id. ¶16). Mr. Berutti exhibited and had no symptoms of COVID-19 or any other communicable disease or illness when

he entered the courthouse. (Id. ¶ 17). Mr. Berutti was thereafter instructed to wait in his automobile and the Court would call him with instructions. (Id. ¶ 18).

Shortly after arriving in his automobile, Mr. Berutti received a call from Honorable Peter G. Sheridan, U.S.D.J., who advised that Mr. Berutti's two adversaries were in the courtroom, and that if Mr. Berutti had no objection, Judge Sheridan would entertain oral argument with his adversaries in the courtroom and Mr. Berutti remotely in his automobile. (Id. ¶19). Mr. Berutti objected on grounds that the Order violated his Equal Protection rights under the 14th Amendment of the United States Constitution, and that the Order violated the Statute and the Regulation. (Id. ¶20).

### B.   <u>The Emergency.</u>

Mr. Berutti and MNB have multiple cases pending in the District, and also have cases pending in other U.S. District Courts as well, including in the Eastern District of New York, the Southern District of New York, and the Southern District of Ohio, Western Division. (Id. ¶21). The existence of standing orders which would prevent the plaintiffs from appearing in federal courthouses thus presents an emergency issue which requires expedited review and relief. (Id. ¶22).

The day after Mr. Berutti was prevented from entering the courthouse, a telephone conference was held by Judge Sheridan and all counsel in the subject legal action. (Id. ¶23). When Mr. Berutti originally objected to being excluded from the

courthouse, Judge Sheridan set a schedule for the plaintiffs to file a motion related to the Order in the subject legal action, *Falcone v. Dickstein*, 3:22-cv-921 (PGS)(TJB) (the "Action"). (Id. ¶24). During the phone conference, Judge Sheridan advised that since the Order was entered by Judge Wolfson, it would be necessary for the plaintiffs to raise the issue with Judge Wolfson. (Id. ¶25). Judge Sheridan was specifically asked how to so proceed, and His Honor advised that he could not give Mr. Berutti guidance on such issue. (Id. ¶26). Judge Sheridan also advised that Standing Order 2021-08 was the operative Order which had to be challenged. (Id. ¶27).

Over the course of the next several weeks, in addition to handling their normal caseload, the plaintiffs attempted to determine how such a challenge to the Order could be presented to Judge Wolfson, since there was no active litigation related to such Order, and since Judge Wolfson did not preside over the Action. (Id. ¶28). Although it certainly was not the plaintiffs' preference to do so, and being mindful of *Fed. R. Civ. P.* 11, ultimately it was determined that a separate lawsuit seeking a declaratory judgment had to be filed against Judge Wolfson, since there appeared to be no other way in which standing would be conferred so as to challenge the Order. (Id. ¶29). As a result, this lawsuit was filed challenging the Order, which was the specifically described operative Order at the time Mr. Berutti was barred from the courthouse. (Id. ¶30).

### B. **The Order.**

Among other things, the Order requires that attorneys and others visiting courthouses within the District provide "[a]cceptable proof of vaccination" against COVID-19. (Id. ¶31, Ex. A). Alternatively, the Order permits entry upon "proof of a negative result from a PCR test (not a rapid test) taken no more than 72 hours prior to seeking entry…" (Id. ¶31). It is believed that other U.S. District Courts have similar Orders in place including, without limitation, that which is attached to the Amended Complaint as **Exhibit 15** at paragraph 17 thereof. (Id. ¶32, Ex. 15).

### C. **The Statutory Prohibition of the Order.**

All or virtually all presently available purported COVID-19 vaccines are available only because they have received EUA approval by the FDA pursuant to the Statute. (Id. ¶34). PCR tests likewise had been authorized by the FDA as EUA. (Comp. ¶35, **Ex. 4**).  Effective January 1, 2022, such EUA approval was withdrawn, such that PCR tests are no longer authorized for use in testing for the SARS-CoV-2 virus, which sometimes causes COVID-19. (Comp. ¶36, **Ex. 4**). Although the FDA has given full, unconditional approval for two COVID-19 vaccines, those two being Pfizer's Comirnaty and Moderna's Spikevax, neither such vaccine is presently being manufactured or otherwise is available to the public except, possibly, in extremely limited quantities. (Comp. ¶37, **Exs. 5, 6, 7, 8, 9**).  Indeed, if Comirnaty and Spikevax were being manufactured and were generally available to the public, then pursuant

to the Statute, Pfizer, Moderna, and Johnson & Johnson would no longer be permitted to distribute their EUA authorized vaccines, as non-EUA vaccines would be available for use. (Comp. ¶38). If non-EUA vaccines were made available, then these pharmaceutical manufacturers would lose their immunity for use. (Id. ¶39; Statute).

Pursuant to the Statute's "informed consent" provision, any person given the option to take an EUA product, be it a vaccine, a drug, or a therapy, has an absolute right to refuse such EUA product. (Id. ¶40). Pursuant to the Regulation: **"A statement that participation is voluntary, refusal to participate will involve no penalty or loss of benefits to which the subject is otherwise entitled, and the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled,"** is required whenever an individual is offered a  so-called COVID-19 vaccine. (Id. ¶41). Since only EUA vaccines are available, the Order cannot coerce or penalize those who refuse vaccination, who refuse to produce a vaccine card, or those who refuse to take an unauthorized PCR test. (Id. ¶42).

### D. The So-Called COVID-19 Vaccines are not Effective.

Moreover, the purported vaccines are neither safe nor effective based on traditional metrics of safety and effectiveness. (Id. ¶43; Babich Dec.¶¶1; Pedulla Dec. ¶¶ 2). In 2017, the FDA published proposed guidance as to truth in advertising

11

which would have required that if a product's effectiveness is to be advertised, the pharmaceutical company should base such effectiveness on the Absolute Risk Reduction ("ARR") of the product, which is a percentage of those receiving a benefit from the product as measured against the entire population of those administered the product in the pharmaceutical study. (Comp. ¶44). In such proposed guidance, the FDA suggested that for proof of effectiveness, the Relative Risk Reduction ("RRR") should not be used or, if used, should be compared to the ARR. (Comp. ¶45). The RRR merely compares the number of people in the study who contracted SARS-2, the virus which sometimes causes COVID-19, against those in the study who contracted SARS-2 who had been administered a placebo. Such comparison was of mere fractions of a much greater number of individuals who received the shots in all three studies (Pfizer, Moderna, and Johnson & Johnson), the overwhelming majority--over 98% --of whom saw no benefit at all from the shots in each case (Comp. ¶46-48; Pedulla Dec. ¶ 41)

The so-called COVID-19 vaccines that have been approved for EUA, according to the pharmaceutical companies' own published trial data, all had a very low possibility of providing a personal benefit to individuals in general even in optimal, pre-variant, circumstances. As will be detailed below, variants make the so-called vaccines even less effective and, perhaps, completely worthless. (Comp. ¶47; Pedulla Dep. ¶16, 17). More specifically, the studies of the three available EUA

shots were commonly being touted as being around 95% effective, which was the RRR. However, that ARR--which compares the total number of those who received a benefit from the shot against the whole population of those receiving the shot in the study--for each was below 2%, and for Pfizer it was below 1%. *This is not speculation; the information comes directly from the three manufacturers' own published study data*. (Comp. ¶48; Pedulla Dec. ¶18, 39)

   **(i)**  **The Pfizer study.**

   An article published in the <u>New England Journal of Medicine</u>, December 10, 2020, titled "Safety and Efficacy of BNT162b2 mRNA Covid-19 Vaccine," details the results of Pfizer's Phase 3 study of its commonly available EUA vaccine. (Comp. ¶49; Pedulla Dec. **Ex. 2e**). On page 2, under "Results" the authors note that there were a total of 43,548 participants in the study, all of whom received injections. 21,720 received the Pfizer vaccine, and the remaining 21,728 received a placebo. (Comp. ¶49; Pedulla Dec. 25-28). **Of the 21,720 participants who received the so-called vaccine, only 8 came down with cases of COVID-19 at least 7 days after the second dose. Of those receiving the placebo, only 162 cases of SARS-2 (the virus that in only some cases caused COVID-19) were reported after at least 7 days.** (Comp. ¶50; Pedulla Dec. 26). Relative to placebo, there were 154 fewer cases of SARS-2 among those injected with the Pfizer shot versus those receiving placebo (162 people). Thus, the RRR is calculated as 154/162, or 95%.  Such percentage is

the commonly used "effectiveness" percentage which was widely reported to the general public. (Comp. ¶52; Pedulla Dec. 27). However, **the Pfizer ARR--meaning the percentage of people actually benefitting from the Pfizer vaccine across the entire population of those receiving the shot in the study--is calculated at 154/21,270, or a mere 0.73% (rounding up) effectiveness rate.** (Comp. ¶53; Pedulla Dec. 28). Another way of looking at this number is that **more than 138 individuals must be vaccinated for 1 person to receive a benefit** from the vaccine (21,270/154). (Comp. ¶54; Pedulla Dec. 29). Thus, the Pfizer vaccine, under the optimal pre-variant circumstances of the time, was barely effective at all in terms of actually reducing the risk that a person receiving the shot **actually** would receive a benefit from the shot. These calculations are from taken from Pfizer's own data. (Comp. 55; Pedulla Dec. 29)

**(ii)    <u>The Moderna study.</u>**

An article was published December 30, 2020 in the <u>New England Journal of Medicine</u>, titled "Efficacy and Safety of the mRNA-1273 SARS-CoV-2 Vaccine", regarding the Moderna vaccine. (Comp. ¶56; Pedulla Dec. **Ex. 2f**). The article details that of the total of 30,420 participants in the study was broken down into equal numeric groups of 15,210 participants, half who received the Moderna shot, and the other half who received a placebo. (Comp. ¶57; Pedulla Dec. 31) Of those injected with the Moderna shot, only 11 participants tested positive for SARS-2 after at least

14

14 days. Of those receiving a placebo, only 185 participants tested positive. Consequently, a total of 174 people benefitted from the Moderna shot (185-11), when compared relatively to placebo. Thus, the highly discussed RRR benefit of the vaccine is calculated as 174/185, or 94%.  (Comp. ¶58; Pedulla Dec. 32). However, **the ARR is calculated as 174/15,210, or 1.15% (again, giving Moderna the benefit of the doubt, and rounding up), because only 174 people out of a total of 15,210 with a placebo became infected with SARS-2 during the test period.** (Comp. ¶59; Pedulla Dec. 33) Another way of looking at this is that **more than 87 people have to be vaccinated for 1 person to receive a benefit**. (15,210/174). (Comp. ¶60; Pedulla Dec. 33).

### (iii)    The Johnson & Johnson study.

An article in the New England Journal of Medicine titled "Safety and Efficacy of Single-Dose Ad26.COV2.S Vaccine against Covid-19", was published June 10, 2021, regarding the Johnson & Johnson vaccine. (Comp. ¶61; Pedulla Dec. ¶34, **Ex. 3g**). Johnson & Johnson injected 19,630 participants with their shot, and 19,681 with placebo. (Comp. ¶62; Pedulla Dec. 35). Relative to those receiving placebo, a total of 116 of those who were vaccinated contracted SARS-2 within at least 14 days thereafter, compared to 348 in the placebo group.  Thus, 232 people injected with the vaccine benefitted from receiving the vaccine relative to the placebo group (348-116). Consequently, the RRR for the Johnson & Johnson vaccine is calculated as

15

232/348, or 67% (rounding up). (Comp. ¶63; Pedulla Dec. 36). After at least 28 days, 66 of those receiving the vaccine tested positive for SARS-2, while 193 cases were recorded in the placebo group, thus constituting a net relative benefit to 127 people (193-66). Thus, after at least 28 days, the RRR for the Johnson & Johnson vaccine is calculated as 127/193, or 67% (rounding up). (Comp. ¶64; Pedulla Dec. 37). Giving Johnson & Johnson the full benefit of the doubt by adding the 14 and 28 day beneficial recipient number together (232+127), the Johnson & Johnson shot provided an actual benefit to 359 individuals. Thus, **ARR--the percentage of people who received that shot who actually received a benefit from receiving the vaccine--is calculated as 359/19,630, or 1.83%.** (Comp. ¶65; Pedulla Dec. 38). Another way of looking at these numbers is that more **than 54 people have to be vaccinated for 1 person to receive a benefit.** (Comp. ¶66; Pedulla Dec. 38),

Regardless of which so-called Covid vaccine is taken, it now is well known that those receiving only two shots are not protected by those shots at all in terms of testing positive for SARS-2 or spreading SARS-2. (Comp. ¶67; Babich Dec. 42) Moreover, even those with two booster shots test positive for SARS-2, including Anthony Fauci, M.D., who is perhaps the greatest proponent in the world of the so-called vaccine, yet who twice tested positive for SARS-2 exposure, and who contracted COVID-19, after receiving two booster shots. (Comp. ¶68; Pedulla Dec. 42). Nor does being fully up to date with boosters prevent death, as the loss of former

Secretary of State Colin Powell attests. (Comp. ¶69; Pedulla Dec. ¶42)

   **E.  The So-Called COVID-19 Vaccines are not Safe.**

   There have been a far greater number of vaccine-associated deaths reported to VAERS in 2021--during the first three quarters of the year only--than in any of the last 30 years in the operation of the VAERS system. **Fully half of the vaccine-related deaths that have ever been reported to VAERS *since 1990*, have occurred in 2021.** (Comp. ¶70; Pedulla Dec. 20).  Normally, 120-150 total vaccine-related deaths are reported to VAERS *annually*. However, between December 14, 2020, when the Pfizer shot was rolled out, and July 6, 2022, VAERS has received reports of 15,380 deaths, which is over 800 deaths *per month.* (Comp. ¶71; Pedulla Dec. Exhibit 2b). Another way of understanding the potentially grave danger presented by the COVID-19 shots is that it has been reported that during the entire *twenty year* period of the Afghanistan and Iraq wars *combined*, through October 2021, a total of 7,054 United States Military forces were killed. *The number of reports of death received by VAERS in under two years is more than double that of the total deaths in the 20 year Afghanistan/Iraq wars combined.* (Comp. ¶72, **Ex. 11**). In additions to deaths, the CDC has received thousands of reports of COVID-19 shot injuries, many of which are serious, life-threatening, and life-altering, such as myocarditis, pericarditis, anaphylaxis, thrombosis with thrombocytopenia syndrome, and Guillain-Barré syndrome, among dozens of other injuries. (Comp.

¶73; Babich Dec. ¶22, **Ex. 3b, Ex. 10**).

According to OpenVAERS.com, a private organization that posts publicly available CDC/FDA data of injuries reported post-vaccination, it is believed that over the life of the VAERS system being in place, reporting is as low as 1%. But even if reporting has been at 50%, that would translate to over 30,000 deaths by the so-called COVID-19 vaccines in under two years. (Comp. ¶74, **Ex. 12**). Indeed, the plaintiffs' expert, Michael Babich, Ph.D.,  asserts that as a matter of scientific fact, COVID-19 shots are not actually vaccines at all in the traditional sense, and they are not capable of giving a person immunity from the SARS-2 virus, which is the virus that sometimes causes infected individuals to develop COVID-19, the disease. (Comp. ¶75; Babich Dec. 24-36). Instead, those receiving such purported vaccines will continually have to get booster shots to keep up with the ever-changing SARS-2 virus, while the unvaccinated will develop natural immunity, which multiple studies show to be superior to vaccine 'immunity'. (Comp. ¶75; Babich Dec. 36-48).

Under the circumstances, the compulsory proof of so-called COVID-19 vaccination, or of a PCR test, violates the statutory and constitutional rights of every person who wishes to enter a courthouse, including duly licensed attorneys in good standing, and adds an additional burden to such licensed attorneys in good standing, whose clients have every right to their attorney to be representing them in the presence of the Court, which is a right which was deeply imbedded in the fabric of

our nation at the time the Constitution was adopted, thus making it a fundamental right engrained in our First Amendment. Consequently, an injunction against enforcement of the Order must be entered, any such EUA COVID-19 vaccine or testing requirement must not be enforced in the future, and attorneys' fees and costs should be awarded to the plaintiffs. (Id. ¶79).

### G.   Decision on the Initial Emergent Application.

On July 20, 2022, the initial Verified Complaint in this matter was filed with an Order to Show Cause seeking temporary restraints. (Id. ¶80). On July 21, 2022, Honorable Susan D. Wigenton, U.S.D.J. ("Judge Wigenton") reviewed and denied the application. A true copy of the Decision and Order ("Decision") is attached to the Amended Verified Complaint as **Exhibit 13**. (Id. ¶81, Ex. 13). Besides technical service issues that had not been complied with (and which are being corrected with this submission), Judge Wigenton noted that the Order had been amended by Standing Order 2022-01, dated March 16, 2021, which provided for rapid testing as an alternative to the PCR test. (Id. ¶82).

As with the so-called COVID-19 vaccines and the PCR test prior to its EUA being withdrawn, all rapid tests also are only available because they are authorized pursuant to the Statute with EUA designation. Thus, the same way that the Statute precludes coerced vaccination, so to does the Statute preclude coerced rapid testing. (Id. ¶83). Attached Amended Verified Complaint as **Exhibit 14** are FDA documents

setting forth EUA approval information with respect to all COVID tests which presently are available to individuals. (Id. ¶84) No evidence exists that any test for the SARS-2 virus is fully FDA approved, such that only EUA tests are available. (Id. ¶85). Further, since both vaccinated and unvaccinated individuals may transmit and contract the SARS-CoV-2 virus, such that only requiring unvaccinated individuals to provide a negative test of any kind is irrational and violates the Fourteenth Amendment's Equal Protection clause. (Id. ¶86)

Moreover, Judge Wigenton found that no emergency was stated since the declination of an alternative is not evidence of exigency. However, since the rapid tests also may not be coerced, the exigency exists despite the new alternative permitted by the Amended Order. (Id. ¶87). Given that Mr. Berutti may be precluded from any and all courtroom activities based on the Standing Orders in question, and since his First Amendment, Fourteenth Amendment, and informed consent rights under the Statute have been violated and may continue to be violated at any time he is called to a federal courthouse, exigent circumstances exist with respect to him, personally. (Id. ¶88). Moreover, since this action is brought not only on his behalf, but also on all similarly situated attorneys, the injury likely is faced by District attorneys daily. (Id. ¶89). Further, since a national injunction is being sought, and practitioners throughout the nation face similar or identical restrictions on their constitutional and statutory rights, the harm is exigent. One such requirement is

included in the document attached to the Amended Verified Complaint as **Exhibit 15** at paragraph 17 thereof. (Id. ¶90). Since the deprivation of constitutional rights always presents irreparable harm, it is alleged that this matter is exigent in nature. (Id. ¶91).

## **LEGAL ARGUMENT**

### **POINT I**

**THE ORDER VIOLATES THE STATUTE AND REGULATION AND, THUS, IS UNENFORCEABLE AND VOID.**

The Order (and now the Amended Order) offers one of three choices for duly admitted attorneys: (1) it coerces individuals to accept a so-called COVID-19 vaccine if they have not already received such shot(s), which are only available because of their EUA status; (2) it coerces individuals to be tested with a completely unapproved PCR test or an EUA rapid test; or (3) it punishes those who do neither by excluding them from District courthouses. Since the Order therefore is coercive and punitive, it violates the Statute and Regulation, and must be vacated.

As set forth above, all of the existing COVID-19 shots and rapid tests are available only through Emergency Use Authority pursuant to 21 U.S.C. § 300bbb, which specifies that each person must be informed **"of the option to accept or refuse administration of the product**, of the consequences, if any, of refusing administration

21

of the product, and of the alternatives to the product that are available and of their benefits and risks." The Statute further provides, at §(e)(1)(A)(ii), that its "conditions [are] designed to **ensure** that individuals to whom the product is administered are informed," of their rights. The FDA, whose powers over the regulation of drugs, vaccines, and therapeutics is ubiquitous, plainly did not intend for "consequences" to mean that medical providers must provide legal advice that the person refusing will not be allowed into a courthouse. Rather, the plain language when read in context means that the medical consequences must be explained.

Indeed, the FDA's "informed consent" regulation leaves no room for doubt that coercion of any kind is prohibited. The Regulation provides the following as being fundamental to informed consent (emphasis added): **"A statement that participation is voluntary, refusal to participate will involve no penalty or loss of benefits to which the subject is otherwise entitled, and the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled."** Only the Secretary of Health and Human Services is statutorily authorized to impose additional conditions for EUA vaccines. 21 U.S.C. 300-bbb(e)(1)(B).  Thus, the Order and the Amended Order, which are coercive in nature, are prohibited by the Statute and Regulation. For such reasons, both are unenforceable and void.

22

## POINT II

## THE ORDER AND AMENDED ORDER VIOLATE THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION.

The nation's legal history and tradition is rooted in the English common law. Making the freedoms created through the English common law permanent as constitutional fixtures was a primary object of the First Amendment's ratification, and extended into the realm of trial practice. The Order in conjunction with the Amended Order deprives members of the District Bar such rights, by compelling them to be vaccinated or tested in order to stand before the Court to argue causes, which violates the First Amendment.

In A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney Gen. of Mass., 383 U.S. 413, 429-30 (1966) (Douglas, J., concurring), Justice William O. Douglas documented the importance to our Founding Fathers of preserving our basic freedoms against government interference with the ratification of the First Amendment:

> To assume that English common law in this field became ours is to deny the generally accepted historical belief that 'one of the objects of the Revolution was to get rid of the English common law on liberty of speech and of the press.' Schofield, *Freedom of the Press in the United States*, 9 Publications Amer. Sociol. Soc., 67, 76.
>
> More specifically, it is to forget the environment in which the First Amendment was ratified. In presenting the proposals which were later embodied in the Bill of Rights, James Madison, the leader in the preparation of the First Amendment, said: 'Although I know whenever

23

the great rights, the trial by jury, freedom of the press, or liberty of conscience, come in question in that body [Parliament], the invasion of them is resisted by able advocates, yet their Magna Charta does not contain any one provision for the security of those rights, respecting which the people of America are most alarmed. The freedom of the press and rights of conscience, those choicest privileges of the people, are unguarded in the British Constitution.'"

The majority in <u>Alden v. Maine</u>, 527 U.S. 706, 733 (1999) (emphasis added), expanded on the concept of the Bill of Rights ensuring preservation of English common law freedoms as follows:

The text and the structure of the Constitution protect various rights and principles. Many of these, such as the right to trial by jury and the prohibition on unreasonable searches and seizures, derive from the common law. The common-law lineage of these rights does not mean they are defeasible by statute or remain mere common-law rights, however. **They are, rather, constitutional rights, and form the fundamental law of the land.**

Under English common law, barristers had a "right of audience" before the court.

The term 'barrister' likely comes from 'the bar' which is generally used in reference to the process of qualifying as a legal professional or to the legal profession in general. A barrister is a law student who has been 'called to the bar'. The term originated in the mid 16th century where the bar was quite literally a barrier or railing in an Inn of Court that separated 'benchers' (*i.e.* the senior members) from the rest of the hall. When a student who was a member of an Inn of Court reached a certain level in their study of the law they would be 'called to the bar'. The etymology of the word became confused after the 17th century. It became a popular assumption that the term referred to the bar or railing in a courtroom that denoted the area that was restricted to participants in a trial or hearing.

https://discover.hubpages.com/education/A-Brief-History-of-Barristers-the-Inns-of-Court.

The right of audience was discussed by Oklahoma Justice Opala in <u>Cities Serv. Co. v. Gulf Oil Corp.</u>, 1999 OK 16, ¶ 14 n.1(1999) (Opala, J., dissenting), as follows (emphasis added):

> When called to the bar of a court, lawyers in England are said to have a right to appear and be heard on behalf of clients. Their professional competence as forensic practitioners confers upon them what is known as *right of audience.* **An American lawyer's *interest in a granted right of audience is every bit as great as* that of a legal practitioner in the United Kingdom. Moreover, the former's license to practice, unlike that of the latter, also is protected by constitutional shields against impermissible government action.** *See* <u>Johnson v. Board of Governors of Registered Dentists</u>, 1996 OK 4 P19, 913 P.2d 1339, 1345; *see also id.* at 1350 (Opala, J., concurring).

Thus, it is clear that the right of an attorney to appear in court on behalf of his or her client is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty" such that it is entitled to heightened constitutional protection. <u>Dobbs v. Jackson Women's Health Org.</u>, 142 S. Ct. 2228; 2022 U.S. LEXIS 3057 *148 (2022) (Thomas, J., concurring).

While it is recognized that when content neutral, "government may impose reasonable restrictions on the time, place, or manner of protected speech," such restrictions must be "narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989)

The idea that the failure of an attorney to be vaccinated with an EUA vaccine suddenly qualifies as reason to bar an otherwise fully qualified and licensed attorney from a District courtroom cannot be taken lightly. Video and phone conferences are no substitute for seeing the body language of one's adversaries, the witnesses, and the Judge, and to be so seen. Further, connecting with a jury entails seeing the jurors, watching them, studying their reactions, and reading their body language. If such was not the case, then there never would be reason to appear in court.

The Order denies some attorneys the ability to so stand and appear, while granting to it others who are 'favored' by possessing a vaccine card. Such preclusion from entry into the courthouse and, thus, the restriction on the attorney's right to speak in the presence of the Court, creates inequities among attorneys and parties. One party being forced to 'appear' on the phone or on video against other attorneys who are appearing in person presents disadvantages which are not permissible under the First Amendment.

There is no legitimate governmental interest in keeping healthy attorneys out of the courthouse because they do not have vaccine cards, while potentially sick attorneys who are vaccinated yet possibly infected with SARS-2 or actually suffering with COVID-19 are still permitted to enter the courthouse. One's vaccination status has absolutely no bearing, scientifically, on whether SARS-2 can or will be transmitted. Likewise, requiring only unvaccinated attorneys to be tested

26

with rapid tests, while those who have received COVID-19 shots must not be so tested, has no legitimate basis in light of the known fact that every single person my transmit and receive the SARS-2 virus whether or not they have received COVID-19 shots and boosters. Thus, the Order is not narrowly tailored to serve a significant governmental interest, such that it is void and must be vacated.

## POINT III

### THE ORDER VIOLATES THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT.

Mr. Berutti is a duly admitted member of the District Bar. His vaccination status is not a qualification for such admission. However, he and all other similarly situated persons are treated unequally because of such status, in violation of the Equal Protection Clause of the Fourteenth Amendment. Particularly given the known ineffectiveness of the EUA vaccines to stop transmission of SARS-2, and of the vaccines to prevent infection with SARS-2, the Order is irrational and cannot withstand scrutiny.

Our Supreme Court wrote, in Romer v. Evans, 517 U.S. 620, 633-34 (1996):

Central both to the idea of the rule of law and to our own Constitution's guarantee of equal protection is the principle that government and each of its parts remain open on impartial terms to all who seek its assistance. "'Equal protection of the laws is not achieved through indiscriminate imposition of inequalities.'" *Sweatt* v. *Painter*, 339 U.S. 629, 635 (1950) (*quoting* Shelley v. Kraemer, 334 U.S. 1, 22 (1948)). Respect for this principle explains why laws singling out a

certain class of citizens for disfavored legal status or general hardships are rare. A law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense. "The guaranty of 'equal protection of the laws is a pledge of the protection of equal laws.'" Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 541 (1942) (*quoting* Yick Wo v. Hopkins, 118 U.S. 356, 369 (1886)).

The Romer Court added (at 634-35):

a second and related point is that laws of the kind now before us raise the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected. "If the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest." Department of Agriculture v. Moreno, 413 U.S. 528, 534 (1973). Even laws enacted for broad and ambitious purposes often can be explained by reference to legitimate public policies which justify the incidental disadvantages they impose on certain persons. … [H]owever in making a general announcement that [here the unvaccinated and untested] … shall not have any particular protections from the law, inflicts on them immediate, continuing, and real injuries that outrun and belie any legitimate justifications that may be claimed for it.

"A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." Eisenstadt v. Baird, 405 U.S. 438, 447 (1972). "[C]lassifications based on disability violate that constitutional command if they lack a rational relationship to a legitimate governmental purpose." Tennessee v. Lane, 541 U.S. 509, 522 (2004). Particular

deference is given to legislative enactments because they are fundamentally the acts of the people themselves in our democratic society. *See* <u>Dobbs v. Jackson Women's Health Org.</u>, 142 S. Ct. 2228 (2022) ("The Constitution is neutral and leaves the issue for the people and their elected representatives to resolve through the democratic process in the States or Congress--like the numerous other difficult questions of American social and economic policy that the Constitution does not address.")

Here, the issue in question is not legislative, but rather, is one of judicial creation. Our Courts have not given such equivalent deference to judicial enforcement of administrative orders. See, *e.g.,* <u>Allen v. Debello</u>, 861 F.3d 433, 440 n.31 (3d Cir. 2017) (surveying cases where Judges may be enjoined against enforcing bar membership requirements they have promulgated since they are acting in a nonadjudicative enforcement capacity).

Moreover, when one's adversaries are in court, the attorney barred from court for being unvaccinated plainly is not competing on equal footing. As noted in <u>Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville</u>, 508 U.S. 656, 666 (1993):

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal

protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

It has become somewhat fashionable to discriminate against those who have refused to be vaccinated with a so-called COVID-19 vaccine, be it for religious, medical, or any other reason. While it may be a broad ambition to prevent the spread of COVID-19, especially where all experience is that those who are vaccinated still can contract SARS-2/COVID-19 and communicate it to others, the discrimination against the unvaccinated causes real, immediate, and continuing injuries that belie any legitimate justification that may be claimed for the rules which have been put in place. This also goes for testing. There is no legitimate state interest in discriminating against the vaccinated and the unvaccinated with respect to testing requirements (assuming, *arguendo,* that either a vaccine requirement or testing requirement is even legally permissible at all under the circumstances, which is denied), when it is a open and obvious fact that the SARS-2 virus does not discriminate against whom it shall infect. Moreover, in light of  Statute and Regulation which precludes coercion or punishment of any kind for those not taking the EUA vaccines or tests, which are the only ones available, the Order must be vacated due to its violating the Fourteenth Amendment's Equal Protection clause.

## POINT IV

## A TEMPORARY RESTRAINING ORDER SHOULD BE GRANTED.

The plaintiffs' first effort at obtaining a temporary restraining order was denied due to their failing to have taken action to notify the defendants of the filing, and because questions existed as to whether an emergency existed at all, or whether the existence of the Amended Order made success on the merits unlikely. Those issues have been resolved with this filing, such that a temporary restraining order is appropriate.

In the Decision, dated July 21, 2022, this Court wrote:

Plaintiff's brief does not specify that the objection delineated which statute and regulation were allegedly violated. Pursuant to Rule 65, a movant requesting an expedited Order to Show Cause ("OSC") with Temporary Restraints without "written or oral" notice to the movant's opponent must present "specific facts in an affidavit or a verified complaint [that] clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," and the movant's attorney must "certif[y] in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1)(A)–(B); see L. CIV. R. 65.1(a) (emphasizing that the movant must provide "a clear and specific showing" of exigency by affidavit or other sworn statement).

Plaintiffs provided a verified complaint, per the Rule 65 requirement, but Plaintiffs did not provide any specific facts—let alone a clear and specific showing—that demonstrate that immediate and irreparable harm will befall Plaintiffs if an injunction is not granted, or that there will be "injury, loss, or damage" resulting before the adverse party can be heard. See FED. R. CIV. P. 65; Fed. R. Civ. P. 65(b)(1)(A)–(B); L. CIV. R. 65.1(a). In fact, Plaintiffs brought this Motion well over a month after the incident that gave rise to this action, which indicates

31

that there is no such exigency. Further, Plaintiffs' counsel failed to provide a certification in writing setting forth efforts made to serve notice to Defendants and the reasons such notice should not be required. *See* FED. R. CIV. P. 65(b)(1)(A)–(B). As such, this Motion does not comport with the specific requirements of Rule 65, and therefore does not meet the minimum benchmark showing for this Court to issue an expedited OSC with Temporary Restraints.

As set forth in the accompanying Declaration of Ronald A. Berutti, the efforts undertaken to advise Judge Wolfson and the Clerk of the Amended Complaint and this application are provided.

Specific facts related to the need for a TRO include that Mr. Berutti and MNB have multiple cases that are pending in the District, such that their attorneys stand to be barred from the District courthouse at any time. Likewise, they have cases pending in other federal courthouses in New York and Ohio, and have provided evidence that at least another courthouse, this one the U.S. District Court in San Francisco, prevents unvaccinated attorneys from entering courthouses and/or courtrooms, all in violation of constitutional and statutory rights described above, including the First Amendment rights of all affected attorneys. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Roman Catholic Diocese v. Cuomo, 141 S. Ct. 63, 67 (2020). Thus, both on their own behalves, and on behalf of all similarly situated attorneys, the plaintiffs have demonstrated the exigency of the circumstances in light of the ongoing irreparable harm being caused by the Order and the Amended Order.

The reason that there was a delay in bringing the action was that the plaintiffs had to determine how it was possible to challenge Judge Wolfson's Order (which the plaintiffs were told was the operative Order), which required research and significant consideration of the propriety of bringing a legal action against a sitting Chief Judge. The legal issue was complicated by Mr. Berutti having been told by Judge Sheridan that the issue was to be brought up with Judge Wolfson. There was no obvious way in which to have Judge Wolfson review the issue. Thus, the ultimate conclusion was that this lawsuit had to be filed so that the plaintiffs could attempt to vindicate their constitutional rights related to the Order and, now, the Amended Order. Needless to say, none of this was taken lightly, and the plaintiffs wanted to be certain that they were acting in a manner which comported with *Fed. R. Civ. P.* 11. In the interim period, the plaintiffs had no appearances scheduled in any District courthouse, although the violation to their rights was ongoing.

In its Decision of July 21, 2022, this Court further wrote:

Further, Plaintiffs' Motion does not set forth any discernable arguments that justify—or even simply explain—a pressing need for a preliminary injunction. Plaintiffs' Motion is devoid of any analysis of the factors that this Court must consider when granting a preliminary injunction. "A preliminary injunction is an extraordinary remedy that is never to be awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). When considering whether to grant a preliminary injunction, courts must consider whether the party seeking the injunction has shown: "(1) a likelihood of success on the merits; (2) he or she will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in

even greater harm to the nonmoving party; and (4) the public interest favors such relief." *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010) (quoting *Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010)). The first factor "require[s] [a] plaintiff to 'demonstrate that it can win on the merits,' which involves a showing that its chances of establishing each of the elements of the claim are 'significantly better than negligible.'" *Mallet & Co. v. Lacayo*, 16 F.4th 364, 380 (3rd Cir. 2021) (quoting *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 & n.3 (3d Cir. 2017)). For the second factor, "[e]stablishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a 'clear showing of immediate irreparable injury.'" *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (quoting *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 359 (3d Cir. 1980)). The first two factors function as critical "gateway factors." *Reilly*, 858 F.3d at 179. If a court finds that the first two factors weigh in favor of the plaintiff, the "court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* "How strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Id.* (quoting *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009) (Easterbrook, C.J.).

Plaintiffs' Motion fails to satisfy the two gateway factors. *See Bimbo Bakeries USA, Inc.*, 613 F.3d at109. To begin with, Plaintiffs have not demonstrated a likelihood of success on the merits because the Motion is based on an Order that has been amended since its entry. The Order was amended by Standing Order 2022-01, ("Amended Order"), which was entered by the Honorable Chief Judge Wolfson on March 16, 2022—nearly three months prior to Mr. Berutti's visit to the Courthouse. Plaintiffs failed to consider or include the Amended Order in the Motion. The Amended Order is available on the District Court's website under the information tab for attorneys. *See* The Honorable Freda L. Wolfson, U.S. Chief District Judge, Standing Order 2022-01, UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY (Mar. 16, 2022), https://www.njd.uscourts.gov/sites/njd/files/SO2022-01.pdf. The

34

Amended Order specifically provides the following: "Standing Order 2021-08 is further amended to provide that visitors seeking entry to Court facilities by way of the testing option may present proof of a negative result from *a rapid test*, rather than a PCR test, along with proof of identification." *Id.* ¶ 9 (emphasis added). Because visitors to the Courthouse have the option to provide proof of vaccination or the results of a PCR test *or* a rapid test, Plaintiffs' arguments that PCR tests are not a viable option, and that rapid testing is not acceptable are largely moot. This Court does not examine the issue of whether vaccination is safe and effective because the argument begins with the premise that an alternative is unavailable, and that is not accurate given the Amended Order.

The second gateway factor is also unmet because Plaintiffs did not provide argument or evidence that they will suffer irreparable harm without a preliminary injunction. *See Bimbo Bakeries USA, Inc.*, 613 F.3d at109. The incident at the heart of the Motion occurred well over a month ago on June 6, 2022, thus there is no obvious exigency to this Motion. Additionally, Mr. Berutti was afforded an alternative means of accomplishing his business with the Court but declined to accept the alternative. (D.E. 2-1 at 9.) The declination of the alternative is not evidence of exigency, and Plaintiffs did not provide any argument indicating that an emergent circumstance and discernible harm have arisen from the event that prompted the instant Motion. Thus, Plaintiffs have not met the burden of proving "a 'clear showing of immediate irreparable injury.'" *ECRI*, 809 F.2d at 226 (quoting *Continental Group, Inc.*, 614 F.2d at 359)).

The plaintiffs have demonstrated in detail that the only so-called COVID-19 vaccines which are available are only available because of their EUA status. The Statute therefore unqualifiedly permits those who are candidates to receive such shots to refuse. The Regulation makes plain that nobody can be coerced into taking the shots or punished for so refusing. Likewise, the rapid tests are also only available because of their EUA status and may be refused without penalty as well.

Likewise, the plaintiffs have demonstrated that the Order and Amended Order violate their First Amendment rights, as detailed above, as well as their right to the Equal Protection of the Laws, per the Fourteenth Amendment. There is no legitimate governmental reason to discriminate between the so-called unvaccinated and the vaccinated when determining who may stand and appear before the Court. Every single person, regardless of whether they have received a shot, is capable of transmitting and contracting SARS-2 and COVID-19. Moreover, the shots are dangerous by any historical standars--more than twice as many reports of death by the shots have been made to the CDC's VAERS system than the total number of military deaths during the 20 year Afghanistan and Iraq wars combined. Thousands of reports of other serious medical conditions associated with the shots have also been made to VAERS, which OpenVAERS.com believes to be greatly underreported as a historical matter.

Further, the plaintiffs have demonstrated through the analysis of the pharmaceutical companies' own studies which was provided by Dominick Pedulla, M.D., that the so-called vaccines never were effective, even before there were variants. As an incontestible point of fact, none of the three EUA COVID shots has an Absolute Risk Reduction--the gold standard of effectiveness--as high as 2%. Thus, the overwhelming majority of people receiving the shots gets no benefit from them in optimal circumstances, but they are exposed to the risks of death and serious

medical injury associated with them, regardless.

The assertion that the shots are "so-called vaccines" is not argumentative. Per the Declaration of Michael Babich, Ph.D., who has created FDA approved vaccines of his own, the mechanism of the COVID-19 shots is different than any prior vaccine that has proved to be successful. True vaccines inject all or most of a "dead" or "dying" virus into a person's body so that the whole virus is identified by the body's immune system, which then recognizes it and eliminates it almost immediately (creating immunity to it). Contrarily, the COVID-19 shots reverse engineer a spike protein that gets produced within an individual's cells. The virus recognizes the host's production of the spike protein and, therefore, mutates into a variant which produces a different protein that defeats the body's immune defenses. Dr. Babich asserts that multiple studies show that natural immunity--acquired by those infected with the virus who have not received the shots--is much more effective at creating lasting immunity than receiving the COVID-19 shots.

Dr. Babich--whose resume and experience is vast and deep--also explains why boosters may be needed forever for those receiving the shots, which thus can create a very dangerous state of vaccine dependency which breaks down the body's immune system to numerous other things as well. Meanwhile, the virus will always become more contagious and less deadly as it mutates, which is a basic principle of virology --a subject that Dr. Babich teaches in a United States medical school.

Under the circumstances, the plaintiffs have demonstrated a likelihood of success on the merits and the existence of irreparable harm.

The nonmoving parties will suffer no harm by a temporary restraining order being granted. At best, there is anecdotal evidence from so-called "experts" that receiving the shot somehow lessens the risks to those contracting COVID-19. But no evidence exists at all that the shots prevent immunity from the virus or that such individuals cannot spread the virus. The fact that as this is being written, President Biden is in quarantine after contracting COVID-19 despite receiving two shots and two boosters is irrefutable evidence of such points. Dr. Fauci likewise contracted COVID-19 and quarantined just recently. Thus, preventing unvaccinated and untested attorneys from entering any courtroom in the United States will cause no discernable harm to the non-moving parties. Contrarily, the attorneys affected by such Orders are being irreparably harmed.

Finally, the public interest favors such relief. Fear and a lack of actual knowledge about the so-called vaccines and the virus is driving policies such as those that are the subject of the Order and the Amended Order. Public policy based on fear, rather than logic, common sense, and legality, is never in the public interest. Every single person can get ill from the virus. The so-called vaccines have no impact on that fact. There should not be a fear of the so-called unvaccinated any more than there should be fear of the so-called vaccinated. Further, nobody should be excluded

from testing if anybody is go be required to test. There is no scientific distinction between the two groups other than what has been put into their bodies, regardless of the demonstrable ineffectiveness of such injections.

It is respectfully asserted that as a nation, we all must learn to live with each other without discrimination of any kind, especially discrimination based on fear. As Dr. Martin Luther King, Jr. once said, "Men ofter hate each other because they fear each other; they fear each other because they don't know each other; they don't know each other because the cannot communicate; they cannot communicate because they are separated."

The plaintiffs have communicated their position. We respectfully assert that such communication has been informative, science-based, constitution-based, statute-based, and thorough. Biases against such positions are, it is respectfully suggested, fear-based or are based on incomplete knowledge of the virus, the so-called vaccines, and the legalities surrounding the same. A temporary restraining order and a preliminary injunction thus is in the public interest, which also has an interest in ensuring that every American's First Amendment and Equal Protection rights are protected, and that their statutory rights and healthcare choices are protected as well.

## <u>CONCLUSION</u>

For the foregoing reasons, a Declaratory Judgment should be entered which voids and vacates the Order, based on violations of the Statute, the Regulation, and for violations of the First and Fourteenth Amendments of the United States Constitution.

Respectfully yours,

MURRAY-NOLAN BERUTTI LLC

*Ronald A. Berutti*

By:_____

Ronald A. Berutti

Dated: July 25, 2022

40