UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RONALD A. BERUTTI and<br>MURRAY-NOLAN BERUTTI LLC,<br>On their own behalves and on behalf<br>Of all other members admitted to the<br>Bar of the United States District Court<br>for the District of New Jersey,<br>including those admitted *pro hac vice,*<br><br>   Plaintiffs,<br><br>v.<br><br>HONORABLE RENEE M. BUMB,<br>Chief U.S. District Judge, in her judicial<br>capacity, MELISSA RHOADS, Acting<br>Clerk of the United States District Court<br>for the District of New Jersey, in her<br>official capacity,<br><br>   Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **CIVIL ACTION**<br><br><br><br>**Civ. No. 2:22-cv-4661 (SDW)(ESK)**<br><br><br><br>**ORAL ARGUMENT REQUESTED** |

---

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS SECOND AMENDED COMPLAINT**

---

**MURRAY-NOLAN BERUTTI LLC**
136 Central Avenue, 2nd Floor
Clark, New Jersey 07066
Phone: 908-588-2111
ron@murray-nolanberutti.com
Attorney for Plaintiffs

On the Brief:
Ronald A. Berutti – N.J. Atty ID No. 023361992

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES............................................................ iii

PRELIMINARY STATEMENT ....................................................... 1

STATEMENT OF FACTS .............................................................. 2

A. OVERVIEW ............................................................................ 2

B.THE PLAINTIFFS WERE BARRED FROM ALL U.S. DISTRICT COURTHOUSES IN NEW JERSEY BECAUSE OF THE ORDER AND AMENDED ORDER.................................................................... 5

C. THE ORDERS ......................................................................... 6

D. JUDGE WOLFSON'S ARTICLE III POWERS IMPLICATED ........ 7

E. WHY THE ORDERS WERE *ULTRA VIRES* ............................... 9

F. THE SO-CALLED COVID-19 VACCINES ARE NOT EFFECTIVE ............ 10

G. THE SHOTS ARE NOT SAFE................................................... 12

LEGAL ARGUMENT ................................................................... 14

POINT I: SUBJECT MATTER JURISDICTION EXISTS SUCH THAT THE MOTION TO DISMISS PURSUANT TO *FED. R. CIV. P.* 12(b)(1) MUST BE DENIED ...................................................................... 14

A. STANDING ORDER 2022-02 DOES NOT MOOT THE PLAINTIFFS' CASE, NOR CAN IT BE CONSIDERED TO DO SO ABSENT JURISDICTIONAL DISCOVERY.................................................... 14

B. MR. BERUTTI AND MNB HAVE STANDING TO BRING THIS LAWSUIT……… ...................................................................... 18

C. THE PLAINTIFFS ARE NOT RAISING A DIRECT CLAIM UNDER THE STATUTE AND REGULATION, BUT RATHER, ARE ATTACKING THE COURT'S AUTHORITY UNDER FED.R.CIV.P. 83 TO PROMULGATE THE ORDERS, FOR WHICH THE PLAINTISS HAVE STANDING........................................................................................ 22

POINT II: THE PLAINTIFFS HAVE STATED PLAUSIBLE CLAIMS, THUS MERITING DENIAL OF DEFENDANTS' *FED.R.CIV.P* 12(b)(6) MOTION..............................................................................24

A. A PLAUSIBLE FIRST AMENDMENT CLAIM HAS BEEN RAISED.......... 25

B. A PLAUSIBLE EQUAL PROTECTION CLAIM HAS BEEN RAISED ........ 30

C. THE CLAIM THAT THE ORDERS VIOLATED 28 U.S.C. 2072 MUST BE DECIDED BY THE COURT UNDER SEPARATION OF POWERS PRINCIPLES, AND OTHERWISE IS VIABLE ..................................................... 33

CONCLUSION ............................................................................ 37

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Alden v. Maine*, 527 U.S. 706, 733 (1999) ......................................... 26

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ...................................... 24

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)
................................................................................................ 24, 25

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) ......................................................... 18

*Burlington N. R.R. Co. v. Brotherhood of Maint. of Way Employees*, 481 U.S. 429, 436 (1987) ..................................... 16, 17

*Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 161 (2016)
.................................................................................................. 15,16

*Carson v. Makin*, 142 S. Ct. 1987, 1997 (2022) ................................ 31

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991) ........................... 35

*Cities Serv. Co. v. Gulf Oil Corp.*, 1999 OK 16, ¶ 14 n.1(1999) ........................................................................................ 28

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2301 (2022) ...................................................................... 28, 31

*Friends of Earth v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 174 (1998) ................................................................... 1, 16

*Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 648 (2d. Cir. 1988) ...................................................................... 16

*John Cleland's Memoirs of a Woman of Pleasure" v. Attorney Gen. of Mass.,* 383 U.S. 413, 429-30 (1966) ........................................ 25

*Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560-61 (1992) ................................................................................................ 18

*Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177 (1803) ................................................................................................ 23

*McTernan v. City of York,* 564 F.3d 636, 657 (3d Cir. 2009) ........................................................................................ 25

*Mulhearn v. Fed. Shipbuilding & Dry Dock Co.,* 2 N.J. 356, 363 (1949) ........................................................................ 35

*Murphy v. Hunt,* 455 U.S. 478, 482 (1982) ........................................................................................ 16

*N.Y. State Rifle & Pistol Ass'n v. Bruen,* 142 S. Ct. 2111, 2131 (2022) ........................................................................ 28

*Ohio v. Robinette,* 519 U.S. 33, 39 (1996) ........................................................................ 17

*Phillips v. County of Allegheny,* 515 F.3d 224, 231 (3d Cir. 2008) ........................................................................ 24

*Roman Catholic Diocese v. Cuomo,* 141 S. Ct. 63, 67 (2020) ........................................................................ 15

*Schumacher v. Nix,* 965 F.2d 1262, 1266 (3d Cir. 1992) ........................................................................ 31

*Walling v. Helmerich & Payne, Inc.,* 323 U.S. 37, 43 (1944) ........................................................................ 1, 2, 16

*Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989) ........................................................................ 29

*Wash.-Southern Navigation Co. v. Balt. & Phila. S.B. Co.,* 263 U.S. 629, 635-36 (1924) ........................................................................ 34

*Yeshiva Univ. v. YU Pride All.*, 143 S. Ct. 1, 3 (2022)
.............................................................................................................. 15

## Statutes

21 U.S.C. § 301 ................................................................................... 1

28 U.S.C. §§ 2072 .............................................1, 3, 4, 7, 8, 22, 23, 36

28 U.S.C.S. § 2072(b) ........................................................................ 23

42 U.S.C. § 1983 .................................................2, 4, 9, 18, 22, 23, 34

45 C.F.R. § 46.116(b)(8) ..................................................................... 1

## PRELIMINARY STATEMENT

On June 6, 2022, the plaintiffs Ronald A. Berutti ("**Mr. Berutti**")and Murray-Nolan Berutti LLC ("**MNB**") had their constitutional rights under the First and Fifth Amendments violated by virtue of a Standing Order entered by Honorable Freda L. Wolfson, C.J.D.N.J. ("**Judge Wolfson**"), and enforced by the Clerk of the Court William Walsh (together, "**defendants**"), which precluded entry into New Jersey's federal courthouse without being vaccinated with the COVID-19 vaccine ("shot") or, alternatively, to produce a negative so-called COVID-19 test ("test"). The shot and the test were only available because they were emergency use authorized ("EUA") by section 360bbb of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.* (the "**Statute**"), which precludes coercion or compulsory use of EUA products. Those choosing not to use an EUA product may not be subjected to any adverse actions for so choosing, pursuant to 45 C.F.R. § 46.116(b)(8) (the "**Regulation**") As such, Judge Wolfson's Standing Order was inconsistent with law, in violation of 28 U.S.C. § 2072, and *Fed. R. Civ. P.* 83(b).

Following this lawsuit being filed, Judge Wolfson issued a new Standing Order which did not require vaccination or testing. However, such new Standing Order did not moot the lawsuit since "[a] defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." *Friends of Earth v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 174 (1998); *Walling v. Helmerich &*

1

*Payne, Inc.*, 323 U.S. 37, 43 (1944). Rather, this action requires determination of conduct which concern pure constitutional issues arising under Article III including three issues of first impression: (1) the scope of judicial authority under *Fed. R. Civ. P.* 83; (2) whether the First Amendment protects an attorney's right of audience--a right which existed in the nation's traditions at the time the First Amendment was ratified; and (3) whether the plaintiffs rights to the equal protection of the laws derived from Article V of the Constitution were violated by Judge Wolfson's Order.

As will be detailed below, this Court has jurisdiction to decided all three of such issues pursuant to 42 *U.S.C.* § 1983 given that declaratory relief has been deemed not to be available to the plaintiffs. Upon review and consideration of such issues, **for which oral argument is requested**, the plaintiffs assert that it will be evident that they are entitled to the injunctive relief sought in the Second Amended Complaint.

## STATEMENT OF FACTS

### A. Overview.

This action is brought by the plaintiffs on their own behalves, and on behalf of all similarly situated individuals and entities, seeking declaratory relief and injunctive relief against defendants, **or any other Federal Court nationwide** in the United States, and further seeking to prevent any future enforcement of Standing Orders compelling the use of EUA shots or testing in order to enter a courthouse.

2

Standing Order 2021-08 (the "Order"), which was issued by Judge Wolfson on September 13, 2021, and Standing Order 2022-01 ("Order"), which was issued by Judge Wolfson on March 16, 2022 ("Amended Order") (together, "Orders"), and were employed to violate the plaintiffs' constitutional rights. (SAC §1)[1] By promulgating the Orders, Judge Wolfson exceeded her authority under *U.S. Const.* Art. III. In particular, Judge Wolfson violated *Fed. R. Civ. P.* 83, which delineates the methods by which an Article III Judge may regulate practice before the Court. More specifically, such regulation of practice **must be consistent with federal law** and, thus, exceeds the authority Congress granted to the Courts to administer themselves in keeping with their Article III powers, pursuant to 28 *U.S.C.* § 2072. (Id. §2).

After this lawsuit was filed seeking a declaratory judgment that the Orders were illegal and unconstitutional, Judge Wolfson rescinded the Amended Order and removed all shot and test requirements. In so doing, the issue is evading review but is capable of repetition since the threat of a purported resurgence of the virus or some other future virus certainly exists such that the issue will again present itself in the future, and the voluntary act of removing the offending Amended Order cannot moot this case. (Id. §3) The Order was not consistent with federal law such that Judge

---

[1] "SAC" refers to the Second Amended Complaint. "Db" refers to defendants' brief in support of the motion to dismiss.

Wolfson exceeded her Article III authority in several ways: first, it violated Mr. Berutti's rights pursuant to *U.S. Const.* Amend 1 in that he was deprived of the Right of Audience, which predates adoption of the United States Constitution and adoption of the First Amendment, such that it was intended to be incorporated therein by the nation's Founders; second, Mr. Berutti and MNB were denied equal protection; third, the Order violated the  and Statute and Regulation, since all available shots and tests are EUA authorized, such that those refusing to take the same may not be shots or tests cannot be discriminated against in any way. (Id. §4) Since Judge Wolfson was required to comply with law in the exercise of her Article III powers, the question of her failure to comply with the Statute and the Regulation is a necessary question to be determined with respect to whether Judge Wolfson exceeded her authority pursuant to 28 U.S.C. § 2072 and *Fed. R. Civ. P.* 83, questions which are exclusively within the purview of the courts to decide. (Id. §5)

By tacitly seeking to coerce individuals to become vaccinated, by punishing those who are not vaccinated, and by interfering with the rights of attorneys to fully advocate on their clients' behalves in the manner contemplated by the Right of Audience, the Order violates the Constitution and laws of the United States such that it may not be enforced, may not be replicated in the future by any United States District Court, such that all such Orders must be enjoined. (Id. §7) Such Orders were not merely "promoting the use of vaccines," (Db 7), which does not violate law, but

4

actually compelled their use or the use of EUA testing in order to have access to the Courthouse, which is a distinction with a difference. The same applies for all COVID-19 tests, which also were only available under EUA designation, such that the alternative of testing also exceeded the Court's powers, since it violated the Statute and Regulation. (SAC §8)

## B. The Plaintiffs were Barred from all U.S. District Courthouses in New Jersey Because of the Order and Amended Order.

On June 6, 2022, Mr. Berutti was scheduled to appear in court on behalf of a client of MNB within the District in the Trenton vicinage. It was his first appearance in federal court since before the Covid-19 pandemic began on or about March 13, 2020. (Id. §17) U.S. Marshalls would not permit him to enter when he failed to produce a vaccine card or negative PCR test result. (Id. §§ 18-19) Mr. Berutti exhibited and had no symptoms of COVID-19 or any other communicable disease or illness when he attempted to enter the courthouse. (Id. §21)

Having failed to comport with the Standing Order, Mr. Berutti was thereafter instructed to wait in his automobile and the Court would call him with instructions. (Id. §22) Shortly after arriving in his automobile, Mr. Berutti received a call from Honorable Peter G. Sheridan, U.S.D.J., who advised that Mr. Berutti's two adversaries **were in the courtroom**, and that if Mr. Berutti had no objection, Judge Sheridan would entertain oral argument with his adversaries in the courtroom and

5

Mr. Berutti remotely in his automobile. (Id. §23) Mr. Berutti objected on grounds that the Order violated his constitutional and statutory rights, and his rights under the Regulation. (Id. §24)

Mr. Berutti and MNB have multiple cases pending in the U.S. District Court in New Jersey, and also have cases pending in other U.S. District Courts as well, including in the Eastern District of New York, the Southern District of New York, and the Southern District of Ohio, Western Division. (Id. §25) Although oral argument of the motion ultimately was held over the telephone, Mr. Berutti (and through him MNB), had been denied access to the courthouse and an in person audience with Judge Sheridan because of the Orders, whereas Mr. Berutti's adversaries on the originally-scheduled oral argument date had been provided with such access, thus ultimately resulting in the plaintiffs filing of this lawsuit. (Id. §§ 26-32)[2]

## C. **The Orders.**

Among other things, the Order required that attorneys and others visiting courthouses within the District to provide "[a]cceptable proof of vaccination"

---

[2] Although defendants' efforts are intended to be thinly veiled smears, the plaintiffs are proud of their work defending civil liberties. Thus, the plaintiffs appreciate defendants' backhanded advertisement of such work, including its newsworthiness, but note that such information is merely gratuitous and is outside the record. Since defendants have violated the command that *Fed. R. Civ. P.* 12(b)(6) motions must strictly be based on the record, and since none of the exceptions to such Rule exist with respect to the information provided to this Court by defendants, their gratuitous and failed smear attempt should cause their motion to be converted to one for Summary Judgment in keeping with the Rule. (*See* Db 3; Db 6)

against COVID-19. (Id. §33) The Order was entered by Judge Wolfson pursuant to the powers delegated to Article III courts by Congress in 28 U.S.C. § 2072. (Id. §34) Alternatively, the Order permitted entry upon "proof of a negative result from a PCR test (not a rapid test) taken no more than 72 hours prior to seeking entry…" (Id. §35) An Amended Order was thereafter entered in January 2022 which provided that any negative test would be satisfactory. (Id. §36)

Following the filing of this lawsuit, Judge Wolfson entered a new Standing Order which rescinded the shot and testing requirements which, upon information and belief, was in whole or in part designed to avoid review of the issues presented by Mr. Berutti and MNB in this lawsuit. (Id. §37) Other U.S. District Courts have similar Orders in place which similarly violate the rights of duly admitted members of the Bar for such districts, such that those Orders also are unconstitutional and illegal. (Id. §38; Db 6-7)

### D. **Judge Wolfson's Article III Powers Implicated.**

Judge Wolfson's power to promulgate the Order and Amended Order stem from 28 U.S.C. §§ 2072 and *Fed. R. Civ. P.* 83, which provides the methods by which local district courts may promulgate local rules and practices. (Id. §39) Judge Wolfson imposed the Order and Amended Order as Chief Judge of the District of New Jersey without public notice, an opportunity for comment, or by acting on a vote of a majority of district judges, as would be required of a valid local rule under

7

*Fed. R. Civ. P.* 83(a). (Id. §40) Thus, the Order and Amended Order were putatively promulgated pursuant to *Fed. R. Civ. P.* 83(b), which provides that when there is no controlling law, a federal judge may regulate practice in a manner consistent with federal law, rules adopted under 28 U.S.C. §§ 2072 and 2075, and the district's local rules. (Id. §41)

Such promulgation of the Order and Amended Order exceeded the scope of Judge Wolfson's authority since they were inconsistent with the Constitution and federal law, such that they violated her powers under Article III, as limited by 28 U.S.C. § 2072 and *Fed. R. Civ. P.* 83, including Mr. Berutti and MNB's rights under *U.S. Const.* and *U.S. Const.* Amends. 1 and 5, and rights under the Statute and Regulation. (Id. §§42-43) Being that the Order and Amended Order are directly related to inherent Article III powers to manage the business of the Judicial Branch, under the Separation of Powers Doctrine, the Executive Branch is powerless to seek relief against Judge Wolfson's violations of the Statute and Regulation in the Order and Amended Order. Rather, questions related to the limitations of Article III powers are strictly the province of the Judicial Branch, such that only a direct action seeking relief under the Statute and Regulation is appopropriate. (Id. §44)

On January 27, 2023, this Court determined that Mr. Berutti and MNB were not entitled to a Declaratory Judgment related to Judge Wolfson's alleged violations of the Statute and Regulation, but permitted the filing of a Second Amended

Complaint. (Id. §45) Thus, this action was brought to seek injunctive relief against the violation of Mr. Berutti's rights (and through him, MNB's rights) pursuant to 42 U.S.C. § 1983, given the unavailability of a declaratory judgment related to the limitations of Judge Wolfson's powers as an Article III as limited by statute and Rule. (Id. §46) Further, for the same reasons, Mr. Berutti and MNB seek a national injunction pursuant to 42 U.S.C. § 1983 with respect all similarly situated Judges who have violated rights of duly admitted members of federal district courts based on COVID-19 shot and testing mandates, which defendants have admitted to existing. (Id. §47; Db 6-7)

### E. **Why the Orders were *Ultra Vires*.**

All or virtually all presently available COVID-19 shots are available only because they have received EUA approval by the FDA pursuant to the Statute. (Id. §48) PCR tests likewise had been authorized by the FDA as EUA. (Id. §49) Effective January 1, 2022, such EUA approval was withdrawn, such that PCR tests are no longer authorized for use in testing for the SARS-CoV-2 virus, which sometimes causes COVID-19. (Id. §50)

Although the FDA has given full, unconditional approval for two COVID-19 shots, those two being Pfizer's Comirnaty and Moderna's Spikevax, neither such shot is presently being manufactured or otherwise is available to the public except, possibly, in extremely limited quantities. (Id. §51) Indeed, if Comirnaty and

Spikevax were being manufactured and were generally available to the public, then pursuant to the Statute, Pfizer, Moderna, and Johnson & Johnson would no longer be permitted to distribute their EUA authorized shots, as non-EUA shots would be available for use. (Id. §52) If non-EUA shots were made available, then such pharmaceutical manufacturers would lose their immunity for use. (Id. §53)

Pursuant to the Statute's "informed consent" provision, any person given the option to take an EUA product, be it a shot, a drug, or a therapy, has an absolute right to refuse such EUA product. (Id. §54) Pursuant to the Regulation: **"A statement that participation is voluntary, refusal to participate will involve no penalty or loss of benefits to which the subject is otherwise entitled, and the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled,"** is required whenever an individual is offered a so-called COVID-19 shot. (Id. §55) Since only EUA shots are available, no Order may coerce or penalize those who refuse shots, who refuse to produce a vaccine card, or those who refuse to take an EUA COVID test of any kind, since all COVID tests and shots are only available due to EUA designation. (Id. §56)

**F.** <u>**The COVID-19 Shots are not Effective.**</u>

Moreover, the shots are neither safe nor effective based on traditional metrics of safety and effectiveness, as easily found in official government documents and the manufacturers' documents. (Id. §57)

In 2017, the FDA published proposed guidance as to truth in advertising which would have required that if a product's effectiveness is to be advertised, the pharmaceutical company should base such effectiveness on the Absolute Risk Reduction ("ARR") of the product, which is a percentage of those receiving a benefit from the product as measured against the entire population of those administered the product in the pharmaceutical study.  (Id. §58) In such proposed guidance, the FDA suggested that for proof of effectiveness, the Relative Risk Reduction ("RRR") should not be used or, if used, should be compared to the ARR. (Id. §59) The RRR merely compares the number of people in the study receiving a benefit from the product against those in the study who were not administered the product.  Therefore, in the COVID-19 testing studies of the shots, the RRR was a measurement merely of those who were not administered the shot, and who thereafter tested positive for SARS-CoV-2 ("SARS-2") in greater numbers as compared to those who received the shot. (Id. §60)

The shots that have been approved for EUA, according to the pharmaceutical companies' own published trial data, all had a very low possibility of providing a personal benefit to individuals in general even in optimal, pre-variant, circumstances. As will be detailed below, variants make the shots even less effective and, perhaps, completely worthless. (Id. §61). More specifically, the studies of the three available EUA shots were commonly being touted as being around 95%

effective, which was the RRR. However, that ARR for each was below 2%, and for Pfizer it was below 1% in its own published data. (Id. §62-85)

## G. **The Shots are not Safe.**

There have been a far greater number of vaccine-associated deaths reported to the Vaccine Adverse Effects Reporting System (VAERS) in 2021--during the first three quarters of the year only--than in any of the last 30 years in the operation of the VAERS system. **Fully half of the vaccine-related deaths that have ever been reported to VAERS since 1990, have occurred in 2021.** (Id. §86) A recent peer reviewed study, published January 24, 2023, has determined that in 2021, over 217,000 Americans died from complications from the shots. (Id. §87) Normally, 120-150 total shot-related deaths are reported to VAERS *annually*. However, between December 14, 2020, when the Pfizer shot was rolled out, and January 18, 2023, VAERS has received preliminary reports of 18,769 deaths which, extrapolated, is over 750 reports of shot-caused deaths *per month*. (Id. §88)[3] Another way of understanding the potentially grave danger presented by the COVID-19 shots is that it has been reported that during the entire *twenty-year* period of the Afghanistan and Iraq wars combined, through October 2021, a total of 7,054 United States Military forces were killed. *The number of reports of death received by*

---

[3] Through March 7, 2023, the last update by the CDC, a total of 19,476 deaths were reported to the CDC as having been caused by the shots.

*VAERS* in *under two years is more than double that of the Afghanistan/Iraq wars* (Id. §89) These are not beliefs, as asserted by defendants, but rather are official government reports and statistics which are judicially noticeable facts. (*See* Db 22)

In additions to deaths, the CDC has received thousands of reports of COVID-19 shot injuries, many of which are serious, life-threatening, and life-altering, such as myocarditis, pericarditis, anaphylaxis, thrombosis with thrombocytopenia syndrome, and Guillain-Barré syndrome, among dozens of other injuries. (Id. §91) According to OpenVAERS.com, a private organization that posts publicly available CDC/FDA data of injuries reported post-vaccination, it is believed that over the life of the VAERS system being in place, reporting is as low as 1%. But even if reporting was at 50%, that would translate to over 30,000 COVID-19 shot deaths in under two years. (Id. §92)

Indeed, the plaintiffs are presenting an expert who asserts, as a matter of scientific fact, that COVID-19 shots are not actually vaccines at all in the traditional sense, and they are not capable of giving a person immunity from the SARS-2 virus, which is the virus that sometimes causes infected individuals to develop COVID-19, the disease, as is detailed in the accompanying Declaration of Michael Babich which is incorporated into the pleadings by reference. Instead, those receiving such purported vaccines will continually have to get booster shots to keep up with the ever-changing SARS-2 virus, while the unvaccinated will develop natural immunity,

13

which multiple studies show to be superior to vaccine 'immunity'. (Id. §93) Pursuant to Dr. Babich, the requirement of blanket vaccination is flawed, as mimicked vaccination and artificial immunity leads to a worse response than natural immunity, and vaccination has led to persistent physiological effects from injecting damaging mRNA into otherwise health human cells. (Id. §94)

## LEGAL ARGUMENT

### POINT I

**SUBJECT MATTER JURISDICTION EXISTS SUCH THAT THE MOTION TO DISMISS PURSUANT TO _FED. R. CIV. P._ 12(b)(1) MUST BE DENIED.**

Defendants wish to avoid the substantive issues of the SAC--issues which have never been decided by this Court--by relying on procedure. However, the issues here are ripe for review, and the plaintiffs have standing to pursue them.

**A.    Standing Order 2022-02 does not Moot the Plaintiffs' Case, nor can it be Considered to do so Absent Jurisdictional Discovery.**

Defendants assert, based on Order 2022-2, "now that Mr. Berutti is free to enter the District's courthouses regardless of his vaccination status or willingness to take a COVID-19 test, there is no live case or prospective controversy for this Court to Decide." (Db18) While Mr. Berutti and MNB agree that the exigency of seeking a temporary restraining order was mooted by virtue of Judge Wolfson's Order 2022-02, plaintiffs never agreed, and absolutely dispute, that the claims made before the issuance of such Order 2022-02 are moot.

First, the plaintiffs assert that their First Amendment rights were violated, such that a live claim with respect to the vindication of such irreparable harm exists without consideration of whether Judge Wolfson attempted to moot the Orders. Our Supreme Court has taken a robust view of First Amendment rights being sacrosanct, such that any loss of such rights at all constitutes irreparable harm. *See Yeshiva Univ. v. YU Pride All.*, 143 S. Ct. 1, 3 (2022) ("The loss of First Amendment rights for even a short period constitutes irreparable harm …); *Roman Catholic Diocese v. Cuomo,* 141 S. Ct. 63, 67 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

Similarly, the plaintiffs assert that their equal protection rights were violated. Thus, unless this Court determines such claims are substantively destined to fail, then the question of mootness is one which the Court should not consider.

The question of mootness otherwise only concerns the plaintiffs claims that Judge Wolfson exceeded her statutory authority and violated *Fed. R. Civ. P.* 83 with the Orders, since Judge Wolfson almost immediately reversed course and issued a new Standing Order which removed all mandates that those entering District courthouses had either to have received EUA shots, or to have available a negative EUA test result.

"As long as the parties have a concrete interest, **however small**, in the outcome of the litigation, the case is not moot." *Campbell-Ewald Co. v. Gomez*, 577

15

U.S. 153, 161 (2016) (emphasis added). It has long been held that "[a] defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." *Friends of Earth v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 174 (1998); *Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37, 43 (1944). Particularly since this dispute is "resolved quickly by executive … action,[4] this controversy is one that is capable of repetition yet evading review." *Burlington N. R.R. Co. v. Brotherhood of Maint. of Way Employees*, 481 U.S. 429, 436 (1987); *see also Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 648 (2d. Cir. 1988). The "capable of repetition yet evading review doctrine," in the absence of a class action, combines two elements: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Murphy v. Hunt*, 455 U.S. 478, 482 (1982).

    (i)    *The challenged action was too short in duration to be fully litigated.*

The first criteria for the "capable of repetition yet evading review" prong is easily met. Very shortly after the plaintiffs filed their lawsuit, Judge Wolfson entered a new Standing Order which removed the offending mandates.

    (ii)    *There is a reasonable expectation that the plaintiffs will be subjected to the same action again.*

---

[4] As set forth below in Point I C., *infra*, Judge Wolfson's actions are executory in nature and derive directly from the Court's Article III powers.

The plaintiffs also satisfy the question of reasonableness.

"Reasonableness … is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

The coronavirus is here to stay. It will never go away per Dr. Babich's report which is incorporated into the SAC. New Jersey may be requiring COVID-19 shots in schools, https://www.senatenj.com/uploads/NJDOH-request-for-stakeholder-input.pdf, and there is no way of knowing what other District Courts may require; indeed some still may require COVID-19 shots or testing. Further, there still are no fully approved FDA COVID-19 shots on the market.

Moreover, the District's Chief Judge has not abandoned the power exercised by Judge Wolfson when promulgating the Orders. In fact, **defendants concede that "it is certainly true that New Jersey could experience another wave of the pandemic premised on a new and virulent strain of the coronavirus…"** (Db 19) Such new and virulent strain well may cause another emergency which forces the Chief Judge once again to confront the reality that individuals may spread the virus, and that EUA shots and tests are available to people such that it is reasonable to believe that they again may be made compulsory for attorneys seeking to enter the courthouse in the absence of the issues raised by the plaintiffs being adjudicated against defendants.

Thus, under the circumstances, where defendants concede that the same issues may well arise again, and multiple other factors support the reasonable belief that the plaintiffs will again be subjected so mandates such as that challenged here, the plaintiffs

**B.** **Mr. Berutti and MNB have Standing to Bring this Lawsuit.**

Defendants attempt to turn the "standing" requirement into a debate about topics other than standing. Such effort cannot be successful.

First, again, the plaintiffs assert that their First Amendment claim regarding the right of audience, and an equal protection claim arising under the Constitution in keeping with *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). Congress has specifically contemplated a remedy against judicial officers for injunctive relief for acts or omissions taken by such judicial officers where there exists no avenue for declaratory relief, as is the case here where the plaintiffs' Declaratory Judgment action was dismissed. *See* 42 U.S.C.S. § 1983

In *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotations omitted), the Supreme Court wrote that for a party to have standing, a plaintiff must demonstrate the existence of three elements:

> First, the plaintiff must have suffered an injury in fact--an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical ... Second, there must be a causal connection between the injury and the conduct complained of--the injury has to be fairly ... traceable to the challenged

18

action of the defendant, and not … the result [of] the independent action of some third party not before the court … Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Mr. Berutti went to court as a member of MNB, and as a fully admitted member of the District Bar on behalf of a client. Mr. Berutti, and through him, MNB, suffered an actual injury in fact due to the Order and Amended Order, which was concrete and particularized. More specifically, because of the Order and Amended Order, Mr. Berutti could not enter the courthouse to argue as lead counsel on behalf of his firm's client in the Action because (a) he did not present a COVID-19 shot card; and (b) he did not present a negative EUA test.

The result was that Mr. Berutti and MNB were deprived at that time (1) of their First Amendment right of audience; and (2) the equal protection of the laws since new criteria for appearing in Court applied to them, but not to other members of the District Bar who either had the EUA shots or showed a negative EUA test, regardless of the fact that Mr. Berutti neither was nor looked sick.

Second, the causal connection between the injury (not being permitted to enter the courthouse) and the conduct complained of (the existence of the Orders which exceeded the Court's authority in light of the Statute and Regulation) is certain.

Third, if Judge Wolfson and the Court Clerk (and all federal judges and court clerks based on a national injunction demand in the SAC) are precluded from

promulgating and enforcing EUA vaccine and/or testing mandates, then the injury will be permanently addressed by a favorable decision.

Defendants' argument that "no harm" befell Mr. Berutti's client is a red herring. The injury which is the subject of the SAC is not that of the plaintiffs' client, but rather, of the plaintiffs themselves.

Defendants also pointlessly argue that Mr. Berutti suffered no "physical, economic, or reputational harm" when he was precluded from entering the courthouse. (Db21) First, it certainly would be damaging to an attorney and his law firm's reputation if he and other attorneys in that office that litigated cases for a living were not able to appear in court. Second, the standing requirement does not require the sufferance of a physical injury, economic, or reputational injury. Here, the injuries include (1) loss of First Amendment rights; (2) violation of the equal protection of the laws; and (3) being subjected to a Standing Order which exceeded the Court's authority and interfered with the plaintiffs' practice, thus demonstrating the specious nature of the argument. Defendants then assert that "Mr. Berutti was given the choice to present proof of full vaccination or a negative COVID-19 test," and merely "disliked both options and assumed that he was entitled to constitutional 'shield' himself from a COVID-19 test." (Db19-20) As such, defendants' argument goes that a choice occurred, as opposed to an injury being suffered, such that standing does not exist. Such argument is specious.

20

Besides there being no "choice" exception to the Standing Doctrince, what defendants completely overlook with such argument is that Mr. Berutti and MNB allege that **both** the COVID-19 injections and the SARS-2 tests are only available under EUA authority. **Per the Statute, no person may be compelled to accept any EUA product, and per the Regulation, nobody may be discriminated against for such refusal.** Mr. Berutti asserts that because he did not accept either EUA product, he was deprived of the First Amendment and Equal Protection rights to stand and appear in Court for MNB on behalf of a client as a member of the District bar, thus constituting an injury sufficient to confer them with standing.

Defendants' argument that the plaintiffs' harm was "self-inflicted" likewise is specious, (Db 22-23), as is defendants' argument that "[t]he Constitution does not shield us from all things we dislike," (Db23), which bears no relationship to this action. Under the Statute, neither the shot nor the test could be compelled. Defendants make no effort to address the important fact that the Standing Order was coercive in nature as it required Mr. Berutti either to take an EUA shot or an EUA test to gain access to the courthouse, neither one of which may be required under the Statute. It is not a self-inflicted harm to exercise one's rights; it is the exercise of a right. That a right was exercised does not deprive the plaintiffs who exercised that right of standing to sue for the harm caused when such right was violated by the Orders.

**C.**  **The Plaintiffs are not Raising a Direct Claim under the Statute and Regulation, but Rather, are Attacking the Court's Authority under _Fed. R. Civ. P._ 83 to Promulgate the Orders, for which the Plaintiffs have Standing.**

Contrary to defendants' assertion, the plaintiffs are not asking for a direct vindication of their rights under the Statute and Regulation, but rather, are seeking a vindication of their rights to be free from Orders which exceeded the scope of the Court's authority to issue such Orders.

As noted above, 42 U.S.C. § 1983 specifically provides for a cause of action "for an act or omission taken in such officer's judicial capacity." Defendants were judicial officers who promulgated and enforced the Orders, which exceeded their authority under 28 U.S.C. § 2072 and _Fed. R. Civ. P._ 83.

The _Federal Rules of Civil Procedure_ "shall not abridge, enlarge or modify any substantive right. All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect." 28 U.S.C.S. § 2072(b). Having been derived from a Congressional grant of authority to the Courts so that the Courts may properly exercise their Article III authority, the _Federal Rules of Civil Procedure_ "have the force of law and may not be disregarded." _See Kandle v. United States,_ 4 F.2d 183, 184 (3d Cir. 1925).

_Fed. R. Civ. P._ 83 provides, in pertinent part (emphasis added):

(a) Local Rules.
(1) In General. **After giving public notice and an opportunity for comment, a district court, acting by a majority of its district judges,**

**may adopt and amend rules governing its practice**. A local rule must be consistent with—but not duplicate—federal statutes and rules adopted under 28 U.S.C. §§ 2072 …

(2) Requirement of Form. A local rule imposing a requirement of form must not be enforced in a way that causes a party to lose any right because of a nonwillful failure to comply.

(b) Procedures When There is No Controlling Law. A **judge may regulate practice in any manner consistent with federal law, rules adopted under 28 U.S.C. §§ 2072** and 2075, and the district's local rules. No sanction or other disadvantage may be imposed for noncompliance with any requirement not in federal law, federal rules, or the local rules unless the alleged violator has been furnished in the particular case with actual notice of the requirement.

Here, the plaintiffs assert that the Orders violated 28 U.S.C. § 2072 and *Fed. R. Civ. P.* 83. The Orders were not entered in keeping with the procedures of subpart (a), thus Judge Wolfson only was permitted to promulgate such Orders if they did not violate subpart (b). However, Judge Wolfson exceeded the scope of her authority by issuing Orders which conflicted with the Statute and the Regulation by compelling attorneys either to take an EUA shot or take an EUA test to enter the courthouse, which was not permitted by law. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). Thus, *only* Judge Wolfson could determine whether she was acting in keeping with law, and so failing, parties harmed by such failure--in this case Mr. Berutti and MNB--have a right of action pursuant to 42 U.S.C. § 1983 to seek an injunction against such acts.

23

Under the circumstances, the plaintiffs have demonstrated numerous ways in which they have standing to sue.

## POINT II

## THE PLAINTIFFS HAVE STATED PLAUSIBLE CLAIMS, THUS MERITING DENIAL OF DEFENDANTS' *FED. R. CIV. P.* 12(b)(6) MOTION.

In evaluating a *Fed. R. Civ. P.* 12(b)(6) motion to dismiss, the Court must accept the plaintiff's well-pleaded allegations as true and draw all reasonable inferences in his favor. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 234 (*quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, to survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege facts sufficient to "nudge her claims across the line from conceivable to plausible." *Phillips*, *supra*, 515 F. 3d at 234 (*quoting Twombly,* 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*, at 556. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

24

A.    **A Plausible First Amendment Claim Has Been Raised**.

Defendants misconstrue Mr. Berutti and MNB's First Amendment claim as an "access to courts" claim (Db 26-28), which it is not. Rather, such claim strictly relates to fundamental First Amendment protections afforded to attorneys who are admitted to the Bar. Defendants fail to address Mr. Berutti and MNB's First Amendment "right of audience" argument other than to assert "[i]t is not clear whether any 'right of audience' exists as a matter of constitutional law, let alone in this specific context." (Db 26). Defendants designate *McTernan v. City of York*, 564 F.3d 636, 657 (3d Cir. 2009), to a footnote for the reason that it is inapposite to the right of audience of attorneys. (Db 26, n.39)

The nation's legal history and tradition is rooted in the English common law. Making the freedoms created through the English common law permanent as constitutional fixtures was a primary object of the First Amendment's ratification and extended into the realm of trial practice. The Orders deprive members of the District Bar such rights, by compelling them to receive an EUA shot or test in order to stand before the Court to argue causes, which violates the First Amendment.

In *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney Gen. of Mass.*, 383 U.S. 413, 429-30 (1966) (Douglas, J., concurring), Justice William O. Douglas documented the importance to our Founding Fathers of preserving our basic freedoms against government interference with the ratification

of the First Amendment:

> To assume that English common law in this field became ours is to deny the generally accepted historical belief that 'one of the objects of the Revolution was to get rid of the English common law on liberty of speech and of the press.' Schofield, *Freedom of the Press in the United States*, 9 Publications Amer. Sociol. Soc., 67, 76.

> More specifically, it is to forget the environment in which the First Amendment was ratified. In presenting the proposals which were later embodied in the Bill of Rights, James Madison, the leader in the preparation of the First Amendment, said: 'Although I know whenever the great rights, the trial by jury, freedom of the press, or liberty of conscience, come in question in that body [Parliament], the invasion of them is resisted by able advocates, yet their Magna Charta does not contain any one provision for the security of those rights, respecting which the people of America are most alarmed. The freedom of the press and rights of conscience, those choicest privileges of the people, are unguarded in the British Constitution."

The majority in *Alden v. Maine*, 527 U.S. 706, 733 (1999), expanded on the concept of the Bill of Rights ensuring preservation of English common law freedoms as follows:

> The text and the structure of the Constitution protect various rights and principles. Many of these, such as the right to trial by jury and the prohibition on unreasonable searches and seizures, derive from the common law. The common-law lineage of these rights does not mean they are defeasible by statute or remain mere common-law rights, however. They are, rather, constitutional rights, and form the fundamental law of the land.

Under English common law, barristers had a "right of audience" before the court. The term 'barrister' likely comes from 'the bar' which is generally used in reference to the process of qualifying as a legal professional or to the legal profession

26

in general. A barrister is a law student who has been 'called to the bar'. The term originated in the mid-16th century where the bar was quite literally a barrier or railing in an Inn of Court that separated 'benchers' (*i.e.* the senior members) from the rest of the hall. When a student who was a member of an Inn of Court reached a certain level in their study of the law they would be 'called to the bar'. The etymology of the word became confused after the 17th century. It became a popular assumption that the term referred to the bar or railing in a courtroom that denoted the area that was restricted to participants in a trial or hearing. *https://discover.hubpages.com/education/A-Brief-History-of-Barristers-the-Inns-of-Court*.

Historically, the right to have a barrister appear in court on another's behalf is traced back to the reign of Edward I (1272-1307), where the forebears of barristers "would act as pleaders, appearing in court and speaking for their clients; and there were those known as 'attorneys', who were also present in court but were there to handle procedural matters and manage their clients' litigation." *https://www.lincolnsinn.org.uk/news/the-regulation-of-barristers-past-present-and-future-stephen-mayson/*.

William Taft (1857-1930), the sometime Chief Justice and President of the United States, noted that "many of the law officers of the Colonies ... , appointed by the Crown before the Revolution, were members of ... [the Inns of Court]", and that the Inns were thus instrumental in "instilling in the communities of the Colonies the principles of

27

Common Law."

*https://lostcityoflondon.co.uk/2021/05/15/the-inns-of-court/*

The right of audience was discussed by Oklahoma Justice Opala in *Cities Serv. Co. v. Gulf Oil Corp.*, 1999 OK 16, ¶ 14 n.1(1999) (Opala, J., dissenting), as follows (emphasis added, citations omitted):

> When called to the bar of a court, lawyers in England are said to have a right to appear and be heard on behalf of clients. Their professional competence as forensic practitioners confers upon them what is known as *right of audience* ... **An American lawyer's interest in a granted right of audience is every bit as great as that of a legal practitioner in the United Kingdom.** Moreover, **the former's license to practice,** unlike that of the latter, **also is protected by constitutional shields against impermissible government action.**

While no binding authority exists either in favor of the right of audience or to the contrary, all known authority supports such right as being engrained into the First Amendment. Thus, this is an issue of first impression which appears to be that a clear right exists for an attorney to appear in court on behalf of his or her client, which right is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) (Thomas, J., Concurring). First Amendment claims deriving from the "traditions of the American people," such that as the right of audience "demands ... unqualified deference." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2131 (2022).

28

While it is recognized that when content neutral, "government may impose reasonable restrictions on the time, place, or manner of protected speech," such restrictions must be "narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)

The idea that the failure of an attorney to receive an EUA shot or test suddenly qualifies as reason to bar an otherwise fully qualified and licensed attorney from a District courtroom cannot be taken lightly. Video and phone conferences are no substitute for seeing the body language of one's adversaries, the witnesses, and the Judge, and to be so seen. Further, connecting with a jury entails seeing the jurors, watching them, studying their reactions, and reading their body language. If such was not the case, then there never would be reason to appear in court.

Moreover, as set forth in the SAC, substantial evidence exists to support that the shots and test were of no value whatsoever to most people, such that making them compulsive plainly is not a significant government interest. Indeed, numerous District Courts throughout the United States did not impose such rules, thus facially demonstrating the existence of other means to attempt to combat COVID-19 in courthouses.

The Order denies some attorneys with the ability to so appear, while granting to it others who are 'favored' by possessing a vaccine card. Such bar to entry into the

courthouse and, thus, the bar to the attorney's right to speak in the presence of the Judge, creates inequities among attorneys and parties. One party being forced to 'appear' on the phone or on video against other attorneys who are appearing in person presents disadvantages which are not permissible under the First Amendment.

Likewise there is no legitimate governmental interest in keeping healthy attorneys out of the courthouse because they do not have vaccine cards, while potentially sick attorneys who are vaccinated yet possibly infected with SARS-2 or actually suffering with COVID-19 are still permitted to enter the court. One's vaccination status has absolutely no bearing scientifically on whether SARS-2 will be transmitted. Thus, the Orders were not narrowly tailored to serve a significant governmental interest, such that it they violated the plaintiffs' First Amendment rights.

**B.    <u>A Plausible Equal Protection Claim has been Raised.</u>[5]**

Defendants contend that Mr. Berutti and MNB's Equal Protection argument must fail because a rational basis existed for the Orders. Such argument again

---

[5] The plaintiffs acknowledge that in this situation, this claim should have been brought pursuant to *U.S. Const.* Art. V, and the argument should be construed in such manner per *Fed. R. Civ. P.* 8(e), so as to do justice. Should the Court be inclined not to determine this issue accordingly, it is respectfully requested that leave be granted to replead this issue, especially since defendants have fully briefed the issue such that no prejudice will befall them.

misconstrues applicable law and the facts pertinent to the SAC. Strict scrutiny applies where "a classification that trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage." (Db 28) (*quoting Schumacher v. Nix*, 965 F.2d 1262, 1266 (3d Cir. 1992)). "To satisfy strict scrutiny, government action "must advance 'interests of the highest order' and must be narrowly tailored in pursuit of those interests." *Carson v. Makin*, 142 S. Ct. 1987, 1997 (2022).

The First Amendment guarantees the protection of our fundamental rights. As set forth *supra*, such fundamental rights include the right of audience.[6] Asserting that the right of audience may be limited by "the minimal intrusion of a COVID-19 test to enter a federal courthouse to practice law," (Db 29), misapprehends the issue. First, defendants ignore the lengthy allegations in the SAC which demonstrate the ineffectiveness and danger of the subject shots. Second, defendants fail to recognize that the shots and tests are only available per EUA designation, such that there is an unqualified right not to take them. Finally, defendants fail to recognize that those exercising such right had an additional qualification for full membership to the

---

[6] *See also Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2301 (2022) (Thomas, J., concurring),(wherein Justice Thomas presented an orderly analysis of 14th Amendment jurisprudence which provided that enumerated constitutional rights are to receive strict scrutiny examination, and that non-enumerated fundamental rights are to be very carefully examined, if not strictly scrutinized).

District bar assessed against only them, in violation of their equal protection rights.

Specifically, although every jurisdiction has its own specific requirements for admission to its bars, within an individual bar, every person has the exact same right to achieve admission to full membership of such Bar, including the right to stand and argue before such jurisdiction's court on behalf of his or her client pursuant to the right of audience.

Admission to the District is governed by *L.Civ.R.* 101.1, which reads, in pertinent part:

> **(a)** The bar of this Court shall consist of … those who may hereafter be admitted in accordance with these Rules.
>
> **(b)** Any attorney licensed to practice by the Supreme Court of New Jersey may be admitted as an attorney at law upon completion of a sworn application submitted to the Court …

The Order and Amended Order provided **new criteria** for full admission to the District's bar, which is that to be fully admitted, members of the District's bar were also require to show proof of having received an EUA injection or a negative EUA test. Under the Order, full membership of the bar is denied to those in non-compliance, which violated their rights to Equal Protection. More specifically, they were denied the right of audience, which goes to the heart of the First Amendment and cannot withstand a strict scrutiny analysis.

Here, the SAC details how the COVID-19 shots are neither safe (*e.g.* there

are 19,476 reports of death by vaccine reported to the CDC through March 7 2023, which number is assumed to be grossly underreported based on historical standards), nor effective (*e.g.* fully 'vaccinated' individuals are getting sick and dying at rates which demonstrate that the product does not stop exposure to the SARS-CoV-2 virus, and does not stop transmission of SARS-CoV-2; and an expert immuno-pharmacologist has presented evidence that natural immunity provides much greater protection than the shots and is less dangerous). Certainly, then, the Order and Amended Order were not narrowly tailored to the pursuit of the government's highest interests since they place attorneys at risk of illness and death. In fact, they were not even rational. Meanwhile, so-called vaccinated attorneys who were infected with the SARS-2 virus were permitted to enter the courthouse unmolested to spread the virus and potentially cause the death and illness of others within the courthouse.

Finally, it is noted that the Order and Standing Order are also *ultra vires*, per *Fed. R. Civ. P.* 83(b), as detailed above.

For all such reasons, the equal protection argument is plausible.

## C.    The Claim that the Orders Violated 28 U.S.C. 2072 Must Be Decided by the Court Under Separation of Powers Principles, and Otherwise is Viable.

As noted above, the plaintiffs claim that the Orders violated the Federal Rules enabling statute and *Fed. R. Civ. P.* 83(b) is plausible. The plaintiffs' claim is <u>not</u> one which directly seeks adjudication of the plaintiffs' rights under the Statute and

Regulation, but rather is one which attacks the Court's authority to enter the Orders. The issues of the Statute and Regulation, although important, are collateral to the cause of action. Since the Court's powers are at issue, only a party aggrieved by the misuse of such powers may challenge the improper exercise of such powers as is the case here. And in this instance, 42 U.S.C. § 1983 specifically provides for such claim.

> *U.S. Const.* Article III § 1 provides, in pertinent part:

> The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.

> *Fed. R. Civ. P.* 83 is authorized by Congress so that the courts may regulate

themselves.

> The function of rules is to regulate the practice of the court and to facilitate the transaction of its business. This function embraces, among other things, the regulation of the forms, operation and effect of process; and the prescribing of forms, modes and times for proceedings. Most rules are merely a formulation of the previous practice of the courts. Occasionally, a rule is employed to express, in convenient form, as applicable to certain classes of cases, a principle of substantive law which has been established by statute or decisions. **But no rule of court can enlarge or restrict jurisdiction. Nor can a rule abrogate or modify the substantive law.** This is true, whether the court to which the rules apply be one of law, of equity or of admiralty. It is true of rules of practice prescribed by this Court for inferior tribunals, as it is of those rules which lower courts make for their own guidance under authority conferred.

*Wash.-Southern Navigation Co. v. Balt. & Phila. S.B. Co.*, 263 U.S. 629, 635-36

(1924) (emphasis added).

The separation of powers is perhaps the most fundamental element of our Constitution's guarantee of liberty of the people. New Jersey Chief Justice Vanderbilt may have best explained such constitutional necessity of respecting the separation of powers when writing in *Mulhearn v. Fed. Shipbuilding & Dry Dock Co.*, 2 N.J. 356, 363 (1949) (emphasis added):

> The doctrine of the separation of powers epitomizes not only the struggle of Englishmen against royal tyranny, running over centuries and leading ultimately to a recognition by the king of the supremacy of Parliament in the matters of legislation and taxation, and of the independence of the judiciary as against both king and Parliament, *Holdsworth*, 10 *History of English Law* 713-724, but also the conflict of the American colonists with royal governors and the English Board of Trade. **The doctrine** evolved from these struggles as rationalized even to the extent of misinterpretation by Montesquieu (see *The Spirit of Laws, c. VI, The Constitution of England* (1748)), **has not only been accepted as a cardinal principle of American constitutional law but has been relied upon from our earliest days as a nation as a fundamental and indispensable bulwark against despotism.** The *Federalist, Paper Nos. XLVII-LI.*

A law provides the Court with the authority to issue Standing Orders. Thus, the legality of such Standing Orders arises from the laws of the United States and, thus, review of Orders may only be by the Court, regardless of their content. Similarly, the Court should "not lightly assume that Congress has intended to depart from established principles such as the scope of a court's inherent power." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991) (quotation omitted)

Thus, we see again that the Court should jealously guard its powers so that separation of powers principles maintain their vitality. The nature of a Court's Standing Orders, and the legality of same, are questions reserved for the Judiciary that strike at the core of Article III, defendants' protestations notwithstanding. (Db 23-25) Consequently, in light of Judge Wolfson's alleged violations of federal law in promulgating the Orders, a plausible claim exists that Judge Wolfson exceeded her authority under 28 U.S.C. § 2072 and *Fed. R. Civ. P.* 83(b), which are issues that only could be brought to this Court by parties aggrieved by such violations, regardless that the plaintiffs rights under the Statute and Regulation are implicated.

For such reasons, the plaintiffs properly are bringing the claim related to the Statute and Regulation since the rights they seek to vindicate truly concern the Court's *ultra vires* exercise of power. While such improper act arises from the Court's failure to follow the law in terms of the Statute and Regulation, the Statute and Regulation are merely collateral to the cause of action, such that any limitations of action under the FDCA do not apply to the plaintiffs' claim.

## <u>CONCLUSION</u>

For the foregoing reasons, defendants' motion to dismiss should be denied in its entirety. Subject matter jurisdiction exists, and all claims stated are plausible.

Respectfully yours,

MURRAY-NOLAN BERUTTI LLC

*Ronald A. Berutti*

By:_____

Ronald A. Berutti

Dated: May 17, 2023